**Abdullah Ahmad BEY et al.**

v.

**Francis H. MULDOON et al.**

No. 30789.

United States District Court
E. D. Pennsylvania.

Nov. 21, 1963.

See also, D.C., 217 F.Supp. 404.

Dorfman, Pechner, Sacks & Dorfman, by Bernard Sacks, Philadelphia, Pa., for Benjamin Hicks, Harry Pintozzi, and others, plaintiffs.

Kelly, Deasey & Scanlan, by William R. Deasey, Philadelphia, Pa., for defendants Francis H. Muldoon, Alfred Corry, Stuart J. Sobelman, Trustees, Robert G. Kelly, Philadelphia, Marine Trade Assn.

Wolf, Block, Schorr & Solis-Cohen, Michael L. Temin, Philadelphia, Pa., for defendant Broad Street Trust Co.

Freedman, Landy & Lorry, Abraham E. Freedman, Marvin I. Barrish, Philadelphia, Pa., for defendants International Longshoremen's Assn., Local Union No. 1291, Richard L. Askew and Abraham E. Freedman.

JOSEPH S. LORD, III, District Judge.

This case is now before the court after hearing on plaintiffs' motion for a preliminary injunction to restrain the transfer of money from a trust fund established pursuant to a collective bargaining agreement between defendants In-

ternational Longshoremen's Association, Local 1291 (ILA), and the Philadelphia Marine Trade Association (PMTA). PMTA is an association of companies, including stevedoring companies, rendering marine services in the Port of Philadelphia. It acts as the collective bargaining agent for its members with the ILA. ILA is the collective bargaining agent for all deep-sea longshoremen who engage in the loading and discharging of oceangoing vessels in the Port of Philadelphia. Plaintiffs are longshoremen who are members of the ILA and who formerly were engaged fairly regularly at the Pennsylvania Sugar Division pier in the unloading of raw sugar for Jarka Corporation, a stevedoring company and a member of PMTA.

On December 23, 1959, PMTA and ILA entered into a collective bargaining agreement (hereafter called the Agreement) which contained the following provision [§ 13(d)]: "* * * Should a system of royalties be determined between the parties hereto as an appropriate method of compensating longshoremen who may lose their job opportunities as a result of technological advancements, then the amount of such royalty shall be predicated upon the royalties paid for the same or a similar device in the Port of New York. * * * "

Shortly after the Agreement was entered into, Pennsylvania Sugar notified PMTA of a proposed change in method of unloading sugar. Under the new system which was later put into effect, the number of men regularly employed was reduced from 133 to less than 60.

PMTA and ILA then entered into negotiations under § 13(d) with respect to Pennsylvania Sugar's change in method. On February 26, 1960, an agreement (hereafter called Supplemental Agreement) was reached whereby the "PMTA-ILA, Local 1291, Royalty Fund" was established, with contributions to be made by the employers at a rate of twenty-eight cents per 2240 pounds of sugar unloaded.

Pursuant to the Supplemental Agreement, funds were paid by Jarka into a bank account which was accompanied by a letter from the attorneys of both the PMTA and ILA instructing the bank to hold the funds until submission of a trust agreement.

This action was instituted on January 22, 1962, by plaintiffs, "sugarworkers", claiming that they alone were entitled to the fund both as a matter of law and as a factual matter,—that they were the sole intended beneficiaries of the agreements between PMTA and ILA. At that time, no trust agreement had yet been entered into by the parties.

Defendants moved to dismiss. We denied the motion on June 26, 1962, 217 F. Supp. 401 (E.D.Pa., 1962), holding that plaintiffs had stated a valid cause of action under § 302 of the Labor-Management Relations Act, there being no trust agreement in existence which complied with § 302(c) (5).

Thereafter, on July 19, 1962, an "Agreement and Declaration of Trust" (hereafter called Trust Agreement) was entered into between PMTA and ILA and defendants again moved to dismiss, now contending that the Trust Agreement complied with § 302(c) (5). Plaintiffs, in the meantime, amended their complaint to state an additional cause of action under § 301 of the Act, contending that their asserted contractual right to the fund could be enforced under this section. Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L. Ed.2d 246 (1962). This court agreed that there was at least an alleged contractual right, and since a factual question was involved which could not be decided on a motion to dismiss, the motion was denied. We found it unnecessary to decide at that time whether the Trust Agreement was in compliance with the Act: 217 F.Supp. 404 (E.D.Pa., 1963).

The Trust Agreement as finally drafted provides that the purposes to which the fund could be put might include either supplemental unemployment benefits to those longshoremen credited with 9,-000 hours during the thirteen preceding years, and/or contributions to an exist-

ing welfare fund to maintain eligibility for longshoremen who lost eligibility due to insufficient work, and/or contributions to an existing pension fund, again to maintain eligibility, and/or "such other benefits * * * as are actuarially feasible." The specific program was to be adopted by the trustees but before becoming effective it had to be submitted to the parties to the agreement, the PMTA and ILA, for their approval. Thereafter, the trustees adopted a resolution (hereafter called the Resolution) providing for payments from the Royalty Fund to the Welfare Fund and to the Pension Fund.

## I. THE COLLECTIVE BARGAINING AGREEMENT AND THE SUPPLEMENTAL AGREEMENT

■ Initially, plaintiffs contend that they as sugarworkers were the sole intended beneficiaries of the collective bargaining contract and supplementary agreement. The intent of the parties, they say, was to benefit the specific "sugarworkers" laid off as a result of changes in sugar cargo handling methods, whereas the Trust Agreement would dilute plaintiffs' rights by extending benefits to all longshoremen in the unit.

The proof has failed to sustain plaintiffs' contention. The testimony makes it clear that § 13(d) was not incorporated into the Agreement with only sugarworkers in mind. Underlying its adoption was the fact that there had been a tremendous loss of job opportunities in New York because of technical advances that had nothing to do with sugar, such as containerization and side-port loaders.

Robert G. Kelly, Esquire, counsel for PMTA and also a defendant, testified (N.T. pp. 195, 196):

" * * * what the ILA was concerned about and what the New York Shipping Association had recognized was the tremendous loss of job opportunities through containerization, side-port loaders, and matters such as that. For example, a container can come into a port, loaded somewhere in the outlands, and be lifted on the ship in a very simple mechanical operation. In addition, the Grace Line had put in a sideloader that conveyed and stowed cargo with one man operating a machine where twenty-one had previously been used. These were the things that everybody was concerned about. * * * And I can assure you that we weren't thinking about sugar; we were thinking about containerization, side-port loaders, and other methods of automation. * * * "

There is no doubt that § 13(d) was analogized to the New York situation, for it provides "that the amount of the royalty shall be in proportion to the royalty paid in New York as the reduction in the number of men employed bears to the reduction in the number of men employed in the Port of New York."

Furthermore, the whole underlying history of § 13(d) shows that the thought behind it long antedated the sugar changeover. Indeed, the genesis of the concept was the use by Lavino (a stevedoring firm) of a "slusher", a machine to move cargo to the center of the hold, sometime before 1955. In 1955, Pennsylvania Sugar adopted a conveyor system in the form of a monorail. The Union and PMTA were unable to agree on the minimum number of men to be employed after the change. The Union contended that this was a matter for negotiation; PMTA contended that the dispute was subject to arbitration. A strike resulted. In a suit to compel compliance with the collective bargaining agreement, the Pennsylvania courts held with PMTA. Philadelphia Marine Trade Association v. International Longshoremen's Association, 382 Pa. 326, 115 A.2d 419 (1955). It was as an outgrowth of this broad dispute that § 13(d) was incorporated into the Agreement in its present form. It is clear that when the Union negotiated the present § 13(d), it did so for the group it represented,—The Union,—and not for an isolated, capsulized segment of the group.

It is quite clear from the circumstances surrounding the inclusion of § 13(d) in the Agreement and from the stated intention of the parties themselves that the thrust of that Section is not to be confined solely to sugarworkers, but is for the benefit of all longshoremen who lose job opportunities as a result of technological advances.

[2] The conclusion we have reached follows settled principles of contract law. The parties to the Agreement are, of course, PMTA and ILA. Both of these parties agree that the construction we have placed on § 13(d) expresses their intent, and the construction placed upon a contract by the parties themselves will be adopted. Sharon Herald Co. v. Granger, 97 F.Supp. 295 (W.D.Pa., 1951). Furthermore, in 3, Corbin, Contracts, it is said, Section 537:

> "* * * When two parties enter into a contract providing for the transfer of property or for conferring any other benefit upon a third party, interpretation should ordinarily be directed to determining the meaning given to the terms of the contract by the two parties who made it. The meaning given to the terms by the third party would be immaterial unless concurred in by the contractors or unless the terms are such as to invite action in reliance thereon by the third party. * * * "

The Supplemental Agreement of February 26, 1960, does not advance plaintiffs' position. Here again, the negotiators had in mind all longshoremen, and not an isolated unit.

A longshoreman goes every day to a "shape-up". If there is work, he works; if there is not, he doesn't. There are between 15 and 18 stevedoring companies along the Philadelphia waterfront, and a longshoreman may work for one of these on Monday, another on Tuesday, and a third on Wednesday. See National Labor Relations Board v. Truck Drivers' Union, etc., 353 U.S. 87, 94, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). Displacing one of these peripatetic workers by automation is like dropping a pebble into a pond,—the ripples spread until the last ripple breaks on the shore. The man who loses a job opportunity with Jarka may displace a man who could have worked for McCarthy, and he, in turn, displaces a man who could have worked for Nacirema.[1] Thus, while it may be virtually impossible to individuate precise men who lost job opportunities through technical advancements at the sugarhouse, nevertheless the McCarthy worker and the Nacirema worker and the rest of the chain that follows them are as much affected by the new sugar unloading methods as is the man who started the reaction.

It is true that at some piers there are more or less regular gangs of workers, the same men being employed at that pier whenever work is available. This was the case at the sugar pier. This does not, however, compel the conclusion that only sugarworkers were affected and that only they were to be benefited. Again, Mr. Kelly testified (N.T. p. 196):

> "This contract—when I say 'lose job opportunities,' I mean all over the waterfront, because if they use containers at one pier the men who do not get a job at that pier will go to another pier to get a job, and that is what we were thinking about. And we were thinking that 'lose job opportunities' applied to the bargaining unit, not to any isolated situation. * * * "

Kelly also testified (N.T. pp. 216–217):

> "A I think they [the sugarworkers] are certainly the first people to be considered; but then the repercussions from that caused other longshoremen to lose job opportunities.
>
> "Q So the only other longshoremen besides the men that worked at Pier 46 who would be entitled, in your opinion, to the fund would be those

---

1. McCarthy and Nacirema are stevedoring companies.

who could show that they had lost job opportunities as a result of a sugar worker from Pier 46 taking their job?

"A   No, I will not subscribe to that at all, because there are very few people that we would be able to identify. We know they did. When, what days, what weeks, what, months, your people from the sugarhouses took their jobs it would be almost impossible to identify them, but we know the men who lost their jobs first are the older men, and that is why in the trust agreement we provided to keep them eligible by payments from the fund for welfare and pension benefits."

However, mere difficulty of identification is not enough to foreclose an intended beneficiary of a fund from sharing in the fund. Even though those displaced by chain reaction may be faceless, they were nonetheless hurt as surely as the sugarworkers were. We cannot and will not conclude that the Union (or PMTA) intended by the Supplemental Agreement to ignore all injured longshoremen except sugarworkers. The Supplemental Agreement was intended to implement § 13(d) of the collective bargaining agreement. Both were equally intended for the benefit of *all* longshoremen who lost job opportunities through automation.

## II.  THE TRUST AGREEMENT AND THE RESOLUTION

■   Section 302(c) (5) is almost a perfect legislative blueprint for a trust agreement involving a fund such as we have before us. The Section practically spells out the required terms of such an agreement. Among the requirements is that " * * * (B) the detailed basis on which such payments [to employes] are to be made is specified in a written agreement with the employer. * * * " The present Trust Agreement falls short of this requirement. It provides, in Article II, Section 2, four different options, any

one or all of which the trustees may adopt.[2] This lack of specificity is clearly condemned by the Act, and although the statutory language is clear enough our conclusion that the Trust Agreement in its present form is violative of the Act is supported by the legislative history. In United States v. Missouri Pacific R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929), the Court said:

" * * *[W]here the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed. * * *  *But the reasons for and the significant circumstances leading up to the enactment may be noticed in confirmation of the meaning conveyed by the words used. * * * *" (Emphasis added.)

Reference to the legislative history shows that the Act was intended to prohibit any receipt of money by unions from employers unless the precise use to which the money shall be put is delineated.

In United Marine Division, I.L.A. Local 333, A. F. of L. v. Essex Transportation Co., 216 F.2d 410 at page 412 (C. A. 3, 1954), the court said:

" * * *   Thus, Senator Taft stated: ' * * * the purpose of the provision is that the welfare fund shall be a perfectly definite fund, that its purposes shall be stated so that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the

---

**2.** Supplemental unemployment benefits, and/or contributions to a welfare fund, and/or contributions to a pension fund, and/or "such other benefits * * * as are actuarily feasible."

employee * * * The tendency is to demand a welfare fund as much in the power of the union as possible. Certainly unless we impose some restrictions we shall find that the welfare fund will become merely a war chest for the particular union * *' 93 Cong.Rec. 4746–7 (1947)."

We therefore hold that the payments by Jarka are in violation of § 302 of the Labor-Management Relations Act because the Trust Agreement does not specifically delineate the purpose to which the payments must be put.

Plaintiffs further argue that § 302 permits only employes of the employer making the contribution to share in the fund so created, and since only Jarka contributed only its employes may benefit.[3] The difficulty here lies in determining who are Jarka employes. Certainly these plaintiffs are. But they are by no means Jarka's only employes. Jarka works all up and down the waterfront. It, like every other stevedoring company, may employ different men from day to day. Is the man who works a week out of the year, or a month, or six months for Jarka and who works the remaining time for different companies a Jarka employe? And finally, is a longshoreman who did no work for Jarka, but who is displaced by an automation-displaced Jarka employe to be denied benefits solely because of his lack of direct association with Jarka, even though, as we have found, the Agreement was intended to benefit all longshoremen? Those are difficulties of solution that arise from the very nature of waterfront employment. They are difficulties that the contracting parties recognized and attempted to resolve by the inclusion of Article I, Sections 2 and 6 in the Trust Agreement:

"*Section 2*—'Employer' means and includes those stevedores who are members of the PMTA. As of the date of this agreement, the only operation subject to the payment of royalties is the discharging of bulk raw sugar from ocean-going vessels in the Port of Philadelphia under contract with the National Sugar Refining Company, Pennsylvania Sugar Division.

"*Section 6*—'Employee' shall mean any employee in the employ of the Employer who shall be included now or shall be included in the future in the collective bargaining unit represented by the Union."

Those definitions recognize the realities of stevedoring-longshoring: a longshoreman is the employe of the waterfront and the waterfront is his employer.

■ Ordinarily, where the parties to a contract define the terms used in the contract, these definitions will govern. The definitions in Article I, Sections 2 and 6 are perfectly clear and reasonable, and under normal circumstances they would control. Does § 302 make them illegal, and hence incapable of enforcement? There are two alternative approaches to the problem. The first is to adhere to the rigid, conceptualistic notion of the employer-employe relationship. Even this narrow approach presents problems of definition, for, as we have seen, the ordinary constancy of such relationship does not exist on the waterfront. This approach would deny any benefit to a worker undoubtedly injured by automation, but who had the fortuitous misfortune never to have worked for Jarka.

The alternative is to look to facts, and not to vacuum-packed concepts. It is, very simply, to recognize the facts that the tutored parties to this Trust Agreement recognized: that longshoremen work for every stevedore, and that the stevedores as a group should be con-

---

**3.** The exception here involved to the general prohibitions of § 302 applies "* * * (5) with respect to money or other thing[s] of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)."

sidered as the "employer" in applying § 302(c) (5).

Welfare and pension funds are desirable. See United Marine Division, I.L.A., Local 333, A. F. of L. v. Essex Transportation Co., 216 F.2d 410 at 411 (C.A. 3, 1954). See also Upholsterers' Inter. Union v. Leathercraft Furn. Co., D.C., 82 F.Supp. 570. No court can escape recognizing the beneficial nature of the trust fund here in question. This is an agreement to provide for those who for a number of years have had fairly regular employment on the waterfront and whose services have become less in demand because of technological changes. The stevedores have agreed to compensate these longshoremen by maintaining their eligibility in pension funds or welfare funds or providing supplemental unemployment benefits if their eligibility for these benefits has been threatened by a decline in hours of employment.

This court is not blind to the evils possible when large amounts of money are paid to a union trust fund. (In another part of this opinion we have recognized the necessity of those safeguards required by the Act and ordered that those safeguards be instituted). But neither can we help noticing the obviously hopeless position into which the ILA and PMTA would be thrust if the court were bound to agree with plaintiffs' literal reading of § 302(c). Such a literal reading would preclude the stevedores from setting up any fund effectively providing for the amelioration of the harmful effects of technological unemployment unless all stevedores participating agreed to contribute to the fund, despite the fact that only one had instituted technological advancements. To expect the others to contribute would be unrealistic.

In Sorrells v. United States, 287 U.S. 435, at pages 446–447, 53 S.Ct. 210, at pages 214–215, 77 L.Ed. 413 (1932) Chief Justice Hughes said:

" * * * Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned. * * * In United States v. Kirby, 7 Wall. 482 [19 L.Ed. 278], * * * [t]he Court said: 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' * * * "

Furthermore, a less than literal interpretation of § 302 does no violence to Congressional aims and frustrates no Congressional policy. A reading of the legislative history of § 302 compels the conclusion that the restriction of "employees of such employer" was inserted in the Act to serve a limited function. Congress' attention had been focused upon the situation in which a union attempted to extract from an employer a promise to make payments to a union that represented employes of one or perhaps more than one employer. Congress considered these payments as substitutes for wages or salaries normally paid directly to the worker. 93 Cong.Rec. 4746(2–3) and 4747(1). I Legislative History of the Labor-Management Relations Act 1947, 458. Theoretically, an employer is willing to pay a certain amount of money for a given unit of work. If an employer agreed to give five cents to a union trust fund for every hour of work by an employe, the hourly wage paid directly to the employe would be five cents less. It is only just, said Congress, that the employe whose hour's work required the employer to make a payment of five cents to the trust fund be assured of reaping the benefit of that payment. See Senator Ball, II Legislative History of the Labor-Management Relations Act, 1322 and 1498.

Congress did not want the union to use these funds for non-union or even general union purposes. 92 Cong.Rec.

5181(1) and 5345 (1–2).[4] Nor, presumably, did it want a union representing employes of more than one employer to use the funds provided by only one employer for the benefit of all the employes represented by the union without regard to which of the union members had earned the right to this payment. These are the evils that Congress sought to avert and no others have been advanced in explanation of the provision in question.

In the instant case, the employer-stevedore will make a payment of twenty-eight cents for every 2240 lbs. of sugar unloaded. This payment is not a substitute for a wage. It is not being made for labor that has been performed by any of the longshoremen who unloaded the 2240 lbs. It is instead payment to the longshoremen whose labor, because of a change in the technique of unloading sugar, is rendered unnecessary and it is not always the man who yesterday unloaded sugar by the old technique who has lost the opportunity of working. That man can go to the next pier and get a work ticket with another gang and perhaps a different employer. It is because of this interchangeability of longshore employment noted previously in this opinion that the man ultimately affected by one stevedore's change in *modus operandi* is not always the employe of that stevedore. There is, therefore, no evil that Congress intended to provide against inherent in the Trust Agreement's providing that those other than former sugarworkers may benefit.

This court is reluctant to construe an ambiguous provision of a statute so as to extend its prohibition beyond the evil that Congress intended to cure. As Judge Medina in Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, at page 404 (C.A. 2, 1957): "* * * statutory terms are not to be interpreted independent of their context and underlying policy. 'Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *.'"

Parenthetically, we note that § 302(c) (5) (C) provides:

"[S]uch payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities. * * *"

Of course, if the Agreement is reframed with the specificity required by the Act, and if the use to be made of the moneys is the maintenance of pension rights, then the Agreement itself will provide the "separate trust" required by the Act.

We therefore hold that in light of the peculiar demands of the stevedoring industry, the Trust Agreement does not violate § 302 in permitting payments to or for the benefit of other than Jarka employes.

The facts and legal conclusions stated in this opinion may be deemed the court's findings of fact and conclusions of law.

## ORDER

And now, November 21, 1963, upon consideration of the pleadings and proof, IT IS ORDERED that defendants are enjoined from paying out any moneys from the PMTA–ILA Royalty Fund under the Trust Agreement of July 19, 1962, unless and until the defendants exhibit to the court a Trust Agreement drawn in accordance with this Opinion.

4. Section 302 had its origin in an amendment to the Case bill, HR 4908, 79th Cong. 2d Sess., proposed by Senator Byrd, 92 Cong.Rec. 4809, which prohibited payment by an employer, or receipt by a representative of any money or other thing of value unless the payment was for wages or for union dues withheld by the employer under a checkoff agreement. After several modifications, including one substantially similar to subsection (c) (5) which was proposed by Senators Taft and Ball, the amendment was agreed to by the Senate, 92 Cong.Rec. 5521–5522, and the Case bill passed. 92 Cong.Rec. 5739. The House accepted the Senate amendments, 92 Cong.Rec. 5946, but the President vetoed the bill, 92 Cong.Rec. 6674, 6678, and it failed of passage over his veto. 92 Cong. Rec. 6678.