**Gustave D. TOENSING et al.,**
**Plaintiffs,**

**v.**

**E. A. BROWN et al., Defendants.**
**No. C–73–0753–CBR.**

United States District Court,
N. D. California.

March 25, 1974.

Fred M. Duman, Castro Valley, Cal., Ralph M. Segura, Farrow, Cahill, Kaswell, Segura & Rader, Oakland, Cal., for plaintiffs.

Johnson & Stanton, Law Offices of Charles P. Scully, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND JUDGMENT

RENFREW, District Judge.

The named plaintiffs, retired carpenters eligible for retirement benefits from the Carpenters Pension Trust Fund for Northern California, have brought this suit as a class action under Rule 23, Federal Rules of Civil Procedure, challenging the administration of that Trust Fund by defendants, current and former trustees of the Trust Fund. Plaintiffs invoke this Court's jurisdiction under 29 U.S.C. § 186(e) and 28 U.S.C. § 1337, and also under the doctrine of pendent jurisdiction.

Plaintiffs have stated two causes of action. First, they complain that the trustees decided, on or about July 1, 1971 [actually July 23, 1971], to increase the pensions of those carpenters retiring on or after July 1, 1971, more than the pensions of carpenters who retired before that date.[1] Plaintiffs attack this action as grossly discrimina-

---

1. The increase was from $9.00 to $15.00 each month per year of pension credit for all pension awards effective on or after July 1, 1971 (except for minimum pensions) and for a 5% across-the-board increase for all pension awards effective prior to July 1, 1971 (again excepting minimum pensions).

tory, arbitrary and capricious, and an abuse of the trustees' authority which has raised the serious possibility of a depletion of the Pension Trust Fund. Plaintiffs assert that defendants' action violates 29 U.S.C. § 186(c)(5) which requires monies paid to such a trust fund to be "for the sole and exclusive benefit" of the employees of the contributing employer. Second, plaintiffs charge that defendants' action constitutes a violation of their fiduciary responsibility as established by California state law. Plaintiffs ask this Court to order defendants to rescind their decision on the differential pension increases and to make across-the-board increases so that pensions for persons retiring before July 1, 1971, will equal pensions for those retiring on or after that date. They also ask for an order awarding plaintiffs the amount of money they would have received if the initial decision had been for equal pension increases and also awarding damages, costs, and attorneys' fees.

Defendants moved for summary judgment on July 20, 1973. That motion was heard on August 29, 1973, and was taken under submission. Subsequently, the Court determined that a hearing should be held on the question of whether the action should be allowed to proceed as a class action. At that hearing, on December 19, 1973, the Court ordered that the action was maintainable as a class action. A class notice was sent to those persons falling within the class represented by the named plaintiffs,[2] and an opportunity was given those persons to choose to be excluded from the class.[3] Plaintiffs have now also moved for summary judgment. Another hearing was held on February 22, 1974, on both motions for summary judgment.

## I. *Sole and Exclusive Benefit of the Employees*

The essential legal question posed by these motions is the proper interpretation of 29 U.S.C. § 186(c)(5).[4] That provision excepts from the general prohibition of payments of money by an employer to a representative of his employees[5] those payments made to a trust fund "for the sole and exclusive benefit of the employees" of the employer. The trust fund to which such payments are allowed must be constituted so that the employer and employees are equally represented.[6] The legal basis of plaintiffs' action is that this provision must be interpreted to mean that the motivation or considerations of the trustees in carrying out their responsibilities must be only the benefit of the employee beneficiaries, and that any other purpose or intention is an illegitimate consideration. Plaintiffs argue that the trustees must be completely independent in administering the trust funds and that they should not consider the recommendations of the collective-bargaining parties binding or obligatory.

The general principles stated by plaintiffs are not an accurate and complete interpretation of § 186(c)(5). They ignore the complexity and the varied purposes which the statutory scheme pursues. The purpose was not simply to

---

**2.** The class is comprised of all those persons including pensioners, beneficiaries, or recipients under joint and survivor options, who have received or are receiving pension payments as the result of pension awards effective prior to July 1, 1971.

**3.** There were 7,294 notices mailed; 1,935 were returned because addressees were deceased or not at address, 22 notices are outstanding, 2,510 chose exclusion from the class, leaving 2,838 members of the class.

**4.** The pertinent portion of § 186 reads as follows:

"(c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents) * * *."

**5.** See 29 U.S.C. § 186(a), (b).

**6.** 29 U.S.C. § 186(c)(5)(B).

establish a trust fund with independent trustees:

"Those members of Congress who supported [§ 186] were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. Congressional attention was focussed particularly upon the latter problem because of the demands which had then recently been made by a large international union for the establishment of a welfare fund to be financed by employers' contributions and administered exclusively by union officials. See United States v. Ryan, 350 U.S. 299 [76 S.Ct. 400, 100 L.Ed. 335].

"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetrate control of union officers, for political purposes, or even for personal gain. [citations omitted] To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established." Arroyo v. United States, 359 U.S. 419, 425–426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959). See also United States v. Ryan, 350 U.S. 299, 305, 76 S.Ct. 400, 100 L.Ed. 335 (1956).

As indicated in *Arroyo, supra,* Congress did not rely solely upon the appointment of neutral, non-employer, non-employee trustees and the application of traditional law governing trusts and fiduciary relationships. Instead it directed that employers and employees be equally represented among the trustees, that "the detailed basis on which * * * payments are to be made [be] specified in a written agreement with the employer",

that there be a way for resolving deadlocks among the trustees, that there be an annual audit of the trust fund, and that the results of the audit be available "for inspection by interested persons * * *." 29 U.S.C. § 186(c)(5)(B). These structural provisions were the statutory devices provided for the protection of the beneficiaries.

■ But plaintiffs argue that the trustees must still be completely independent from the collective-bargaining parties. Indeed the implication of plaintiffs' position seems to be that if the trustees' actions are clearly consistent with and further the interests of the union and employers, those actions are suspect even if they are actuarially sound and otherwise consistent with the interests of the beneficiaries of the trust fund. If only such complete independence of the trustees had been sought, however, Congress would not have enacted § 186(c)(5) in its present form. That section *requires* that employees and employers be equally represented in the administration of the trust fund. It does not prohibit a person from serving both as collective-bargaining representative and as trustee of the trust fund. Congress intentionally placed the trust fund provisions within the collective bargaining context, believing that the trust fund was best managed when the contending views of employer and union were resolved in the best interests of the beneficiaries:

"It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death. While employers in many other industries assume this burden directly, this welfare fund was jointly created by the coal industry and the union for that purpose. Not only has Benedict [the employer] entered into a long-term relationship with the union in this regard, but in compliance with [§ 186(c)(5)(B)] *it has assumed equal responsibility with the union for the*

*management of the fund.* In a very real sense Benedict's interest in the soundness of the fund and its management is in no way less than·that of the promisee union." Lewis v. Benedict Coal Co., 361 U.S. 459, 468–469, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960) (emphasis added).

Language used in a recent decision by the Supreme Court differentiating the meaning of the term "employees" when used in § 186(c)(5) from its meaning when used in 29 U.S.C. § 158(a)(5) also suggests that trustees were not intended by § 186(c)(5) to reside in a noumenal world apart from the difficult realities of the collective-bargaining process:

> "[T]here is no anomaly in the conclusion that retired workers are 'employees' within [§ 186(c)(5)] entitled to the benefits negotiated while they were active employees, but are not 'employees' whose ongoing benefits are embraced by the bargaining obligation of [§ 158(a)(5)]. Contrary to the Board's assertion, the union's role in the administration of the fund is of a far different order from its duties as collective-bargaining agent. To accept the Board's reasoning that the union's [§ 186(c)(5)] responsibilities dictate the scope of the [§ 158(a)(5)] collective-bargaining obligation would be to allow the tail to wag the dog." Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 170–171, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971).

The metaphor used by the Supreme Court suggests that collective bargaining does, at least to some extent, affect the scope of the administrative decisions of the trustees. See also 404 U.S. 157, at 171, n. 11, 92 S.Ct. 383, 30 L.Ed.2d 341. And clearly the collective-bargaining parties do determine the amount of resources that flow into the fund through the employer's contributions.

That the trust fund and collective-bargaining process are not completely separate and independent institutions does not mean that the trustees have no fiduciary responsibilities. It does mean that they may look to the collective-bargaining agreements as guides and, under appropriate circumstances, adopt the terms of those agreements. If, for instance, the union in bargaining with the employer has represented both active and retired employees, it would be odd indeed for the trustees to ignore the changes in payments of pension benefits from the trust fund provided for in the new agreement. If the union did not purport to represent the retired employees, the trustees would have to give full consideration to their interests before accepting the terms of the newly negotiated agreement.[7] But the trustees are not required to provide the same benefits for all beneficiaries. Active workers can properly be given higher benefits than retired workers. See Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 173, n. 12, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); Jensen v. Garvison, 274 F.Supp. 866, 869 (D.Or.1967). The trustees must also certainly consider the impact which the changes would have on the long-term viability of the trust fund. But it would be anomalous to impose upon trustees, as representatives of the employer and union, a duty to ignore the terms agreed upon by the employer and union. Indeed it could place the trustees personally in untenable, conflicting roles. The law does not require such schizophrenic duties.

Plaintiffs have cited out of context statements in a number of reported cases which they claim support the extreme type of independence which they demand of defendants. But when analyzed in light of their facts and specific holdings,

---

7. Retirees' benefits are not a mandatory subject of bargaining. Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). But bargaining over retirees' benefits is permissible. 404 U.S. at 171, n. 11, 92 S.Ct. 383. When bargaining covers benefits payable to both active and retired employees, the union must "balance the interests of all its constituents", a duty of fair representation. 404 U.S. at 173, n. 12, 92 S.Ct. at 394.

it is clear that the cases do not support plaintiffs' interpretation of § 186(c)(5). The district court did state in Lewis v. Seanor Coal Company, 256 F.Supp. 456, 461 (W.D.Pa.1966), aff'd, 382 F.2d 437, 443 (3 Cir. 1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968), that "[i]t was the intent of Congress that such trusts under [§ 186(c)(5)] be separate and apart from the union and employer creating the trust." But that general language was used in holding that an oral modification of the written terms of a trust violated § 186(c)(5)(B), an explicit structural requirement. In Blankenship v. Boyle, 329 F.Supp. 1089, 1113 (D.D.C. 1971), motion denied, 145 U.S.App.D.C. 111, 447 F.2d 1280 (1971), opinion supplemented, 337 F.Supp. 296 (D.D.C. 1972), the court did enjoin "the trustees from operating the Fund in a manner designed in whole or in part to afford collateral advantages to the Union or the operators", but the injunction was given in the context of "practices * * * found to be breaches of trust * * *." The court was not describing the general obligations of trustees under § 186(c)(5). The language in United Marine Division v. Essex Transportation Co., 216 F.2d 410, 412 (3 Cir. 1954), that certain trustees were not representatives of the employees, was used in holding that a promise to make payments to the trustees of a welfare trust by an employer which was not a party to the trust fund was not within the prohibition of § 186(a) and (b). In American Bakeries Company v. Barrick, 162 F.Supp. 882, 884 (N.D.Ohio 1958), aff'd by order, 285 F.2d 426 (6 Cir. 1960), the question posed was "whether the court should declare the complete separation and *physical divorcement* of the trust fund offices from the Union offices * * *." (emphasis added) This was a structural, physical question rather than one of the complete intellectual independence of the trustees from the collective-bargaining context.

 █ Plaintiffs also suggest that the motivation of the trustees is critical: If their primary motivation is directed toward objectives other than the "sole and exclusive benefit" of the beneficiaries, then their action is unlawful. Plaintiffs place too much reliance in their arguments on the slippery concept of motivation and not enough on the question of type and sufficiency of proof of improper action. § 186(c)(5) is clearly directed against the payment of funds to persons other than the beneficiaries and also against the use of funds supplied by one employer for the benefit of the employees of other employers. Bey v. Muldoon, 223 F.Supp. 489, 495–496 (E.D.Pa. 1963), aff'd per curiam, 354 F.2d 1005 (3 Cir. 1966), cert. denied, 384 U.S. 987, 86 S.Ct. 1888, 16 L.Ed.2d 1004 (1966). Trustees are indeed held to high standards of honesty and good faith, and they are called upon to resist bad faith efforts by the union or employer to utilize the trust fund for their own ends. See Insley v. Joyce, 330 F.Supp. 1228, 1234 (N.D.Ill.1971):

> "If the purposes *and effects* behind this provision are thus primarily to benefit the union and penalize employees, we clearly are presented with a trust fund that possesses the structural deficiency of not being solely for the benefit of employees." (emphasis added)

Indeed, as in the case of one's struggle for salvation, good motives are not enough. Thus, even if the primary motivation of one trustee is his belief that a pension increase would be in the interest of the beneficiaries, his decision to "bully" the increase through, in a "hasty power play", with the increase "handled as an arrangement between labor and management with little recognition of its fiscal and fiduciary aspects", makes that increase one not for the "sole and exclusive benefit" of the beneficiaries. Blankenship v. Boyle, 329 F.Supp. 1089, 1108–1109 (D.D.C.1971). The court in *Blankenship* found, moreover, that Boyle "considers the Fund in effect the property of the Union to be used in whatever manner the immediate and long-term

objectives of the Union warrant." 329 F.Supp. 1089, at 1109.

██ Though the trustees are held to high standards, they were not intended to be subjected by § 186(c)(5) to a court's speculation as to their motivation behind a decision in the absence of substantial evidence showing that they have neglected or subverted the interests of the beneficiaries. The standard of review which a court must follow in considering a challenged action of the trustees is whether it is arbitrary or capricious. Lee v. Nesbitt, 453 F.2d 1309, 1311 (9 Cir. 1972); Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425, 427 (1968). That standard is not met by merely showing that the trustees adopted the recommendation of the collective-bargaining parties. The trustees have a wide discretion in determining what action would be in the best interests of the beneficiaries. *Cf.*, Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744, 748–749 (1963), cert. denied, 375 U.S. 964, 84 S. Ct. 482, 11 L.Ed.2d 414 (1964).

Therefore, the plaintiffs' proposed interpretation of § 186(c)(5) must be rejected. The next question is whether, considering their factual showings, either side is entitled, under the Court's view of § 186(c)(5), to summary judgment.

II. *The Parties' Factual Offerings*

Defendants' moving papers included affidavits and exhibits which were offered as showing the factual background of the trustees' decision on July 23, 1971, to give a larger pension increase to pensioners retiring on or after July 1, 1971, than to those retiring before that date. C. Bruce Sutherland, secretary to the Board of Trustees, gave the follow-

ing history of the policy that formed the basis of that decision, supplemented by the minutes of the various Board meetings. The Pension Trust Fund was established by a trust agreement as of August 19, 1958. At a Board meeting on December 17, 1962, the Martin E. Segal Company, Inc., consultants and actuaries to the Pension Trust Fund, had proposed three alternative benefit increases, one of which would have given a pension increase to all active carpenters but not to any retired carpenters. That alternative was not adopted by the Board. At the December 17, 1965, meeting of the Board the consultants proposed as one alternative a similar differential; it was not adopted.[8] At the Board meeting on June 28, 1966, the following motion was passed: "that all pensions, including minimum pensions, be increased by 5% effective July 1, 1966, that any benefit increases which may be effected in the future apply only to those carpenters who retire after the effective date of each such benefit increase, whether such increases result from favorable actuarial experience or increased contribution rates * * *." On September 17, 1968, the Board modified its 1966 decision so that those carpenters already retired "shall benefit by way of interest or yield increment but not by subsequent Collective Bargaining changes * * *." On June 17, 1969, the Board increased the pension rate per year of pension credit for pensioners whose awards would first become effective on or after September 1, 1969, from $8.40 to $9.00 and for pensioners whose awards were effective prior to September 1, 1969, from $8.40 to $8.80.

Therefore, the uncontroverted facts[9] demonstrate that the Board had a histo-

---

8. The Board adopted the following provision: "That all other Pensions [other than minimum pensions] be increased by 60%, with recognition by the Trustees that any further benefit increases which result solely from increased contribution rates are to be applied only to those carpenters who retire after the date of any such benefit increase. However, in the event that benefit increases may

be effected as a result of the Fund's favorable actuarial experience in the future, such benefit changes may, in the discretion of the Trustees, be applied to the existing pensioners as well as prospective pensioners."

9. Plaintiffs have tried to raise a factual dispute with respect to this history. They claim that prior to 1971 the Board never followed a policy of restricting future bene-

ry of approving a differential in pension benefits prior to the action in question here.

At its meeting on June 15, 1971, the Board again discussed benefit increases. Alfred A. Figone, an employee trustee, proposed *inter alia* a 5% across-the-board increase in benefits for all pensioners then on the pension rolls and a revision of the unit value per year from $9.00 to $10.00. After an "Employer Caucus," the employer trustees "indicated that in view of the fact that labor negotiations were presently in process and that undoubtedly additional funds and commensurate additional benefits would be shortly forthcoming, the Employer Trustees would prefer not to make any changes in the plan pending final result of said negotiations, at which time the total amount available from a contribution standpoint, would be known to the Trustees and that at that time definitive judgment could be reached with respect to the entire package and that certain adjustments in the benefit level, could, if proper, be applied retroactively." Figone's proposal failed to carry because of a tie vote, with the seven employee trustees voting in favor and the seven employer trustees voting against. Provision was made for calling another meeting on twenty-four hours' notice after a collective-bargaining agreement was executed.

The next meeting was held on July 23, 1971. The minutes of the meeting state the following:

"Mr. Figone discussed with the Board the recently concluded negotiations between the Collective Bargaining Parties with respect to fringe contributions and collateral issues consid-ered in the course of those negotiations. In this respect Mr. Figone noted the recommendation of the Collective Bargaining Parties to the Trustees that consideration be given to a $15.00 unit value and that this will benefit liberalization previously discussed, it being noted that said revised unit value and liberalization were based upon actuarial calculations previously made available, not only to the Board of Trustees, but to the Collective Bargaining Parties."

A motion was unanimously carried which adopted *inter alia* a provision for a 5% increase across the board for all pensioners whose pensions were effective before July 1, 1971 (the increase to be effective August 1, 1971) and a provision for an increase from $9.00 to $15.00 for the unit value per year of pension credit for all pension awards effective on or after July 1, 1971.

Defendants also submitted the affidavit of Berton Jacobson, executive vice president of the Martin E. Segal Company, Inc. He states that his company had never advised the Board of Trustees that the $6.00 increase in unit value for pension awards effective on or after July 1, 1971, was excessive and endangered the fiscal stability of the Pension Trust Fund.[10] He also states "that said increase is not in fact too high and does not endanger the stability of the Fund." [11]

Plaintiffs have not submitted evidence which would raise a triable dispute as to the actuarial soundness of the increase from $9.00 to $15.00 per year of pension credit.

---

fits, from any source, to future retirees. But defendants do not dispute this. Such a policy was proposed in 1966, but was modified in 1968. See text, *supra*. Indeed, in 1971, those retiring prior to July 1, 1971, also received an increase.

10. Defendants also submitted the affidavit of Beverly Heywood, vice president of the Martin E. Segal Company, Inc., who states that she attended one meeting of the Board of Trustees of the Fund which Jacobson had missed and that she had not advised, and to her knowledge no one else at her company had ever advised, the Board that the $6.00 increase was excessive or dangerous for the Fund's stability.

11. See also his testimony at his deposition taken on August 22, 1973, at pp. 45–47, in which he states that he advised the trustees before the increase was approved that it would be actuarially sound.

Plaintiffs have offered the following factual evidence. Four of the employee trustees who voted to adopt the increases in 1971 retired after July 1, 1971. E. A. Brown retired effective January, 1972; Gail Gordon retired effective February, 1972; Dave Williams and Alfred A. Figone retired effective June, 1972. Defendants do not dispute these retirement dates, although they do dispute any inference to be drawn from them that the higher increase for those retiring on or after July 1, 1971, was designed specifically to benefit these four trustees.

Plaintiffs assert that at least two, and perhaps three, of the employee trustees approving the 1971 increases had also participated in the collective-bargaining negotiations prior to the Board meeting on July 23, 1971.[12] Defendants do not dispute this fact.

Plaintiffs point to a conflict or confusion in the deposition testimony of Larry W. Null and Alfred A. Figone, both employee trustees at the time of the 1971 decision, concerning the manner in which the union membership was consulted about the increase in pension benefits.[13] Plaintiffs have also offered an affidavit of Wilfred J. Stone who states that he attended a few union meetings from January 1, 1971, through March 1, 1971, and that he never heard nor was informed "that negotiations were being held with the employers for a new contribution rate to the retirement fund, and that the increase in the rate would be used to increase the pension for post-July 1, 1971 retirees from $9.00 to $15.00 for each unit of credit." In another affidavit submitted by plaintiffs, Vivien Paul Kaufenberg states that he attended several meetings of a local during the period of January, 1971, to July, 1971, and that he also heard nothing of the proposed increase.

This evidence concerns the manner in which the union consulted its rank and file about the proposed increase. This issue, however, is not material to any of plaintiffs' claims in this action. It would perhaps be material to a claim that the union failed to follow its prescribed procedures in collective bargaining and that it unfairly represented some union members. But those claims have not been made here, and, apart from that fact, the record does not support any inference that those claims would be at all colorable.

The testimony of Null and Figone, however, does establish that the collective-bargaining parties did recommend the pension increases subsequently adopted by the Board on July 23, 1971, and that Null and Figone, two of the fourteen trustees approving the increases, felt "obligated" or "bound" to follow that recommendation if actuarially sound.[14]

---

12. See the deposition of C. Bruce Sutherland, August 22, 1973, at p. 20.

13. See the deposition of Larry W. Null, August 23, 1973, pp. 6–13, and the deposition of Alfred A. Figone, August 23, 1973, pp. 8–14.

14. Deposition of Larry W. Null, August 23, 1973, at pp. 17–19:

"Q. And was it your understanding that as a member of the Board of Trustees, you were bound by that recommendation?

"A. Only if it was actuarially sound.

"Q. But aside from the actuarial considerations, was it your understanding that you were bound by that recommendation?

"A. Not that we were bound by it, that we were obligated.

"Q. You were obligated?

"A. Right.

"Q. To vote a 9 to $15 increase in the unit value for retirees who became eligible effective July 1st, 1971; is that correct?

"A. If actuarially sound, yes.

 * * * * *

"Q. Would it be a fair statement to say that the provision for five percent increase across the board came about as a result of the independent exercise of judgment by the Board of Trustees of the Pension Trust Fund?

"A. Based upon actuarial facts, I would say that was probably correct.

"Q. Without regard to any recommendations by the collective bargaining parties?

"A. Not to my knowledge.

 * * * * *

"Q. Would it be a fair statement to say that you felt, as a member of the Board of

Plaintiffs have offered the affidavit of Ernest T. Quick to show that the Trustees allowed at least one person who had submitted an application for retirement prior to July 1, 1971, to receive the $15.00 rate. Quick states that one Orban Hudson had had his pension approved effective June, 1971, but that Hudson had told him that he was allowed to receive the new rate, although he had to forego his first check for June, 1971. Plaintiffs offer the affidavit of Luther H. Curry to establish that he was a participant in the collective-bargaining negotiations and had advised members of his local not to apply for a pension until after the conclusion of those negotiations because pension benefits were to be increased for future retirees. Curry states: "During the time that the negotiations were taking place I repeatedly informed members of Local 1622 who approached me concerning applying for their pension that they should not do so because there was going to be an increase effective July 1, 1971 and I was not sure they would get it if they applied before then." Vivien Paul Kaufenberg also stated in his affidavit that he overheard one union officer tell a secretary who was giving Kaufenberg his pension application that a person named Paul should be told to "wait a while to see what the pension is going to amount to." Plaintiffs have also offered the affidavits of Albert Maddox and Kaufenberg to show that at least two persons, who retired effective June, 1971, would have waited if they had known of the possibility of the higher increase in benefits for persons retiring on or after July 1, 1971.

Defendants deny that there was a secret policy of allowing some persons to take advantage of the higher increase for future retirees despite the fact that they had retired prior to July 1, 1971, or of informing some persons to wait until after July 1, 1971, to retire. They offer the affidavit of C. Bruce Sutherland, secretary to the Board of Trustees, who states:

"That as previously alleged the meeting of the Board of Trustees at which the motion was passed to increase the amount payable per year of pension credit from $9.00 to $15.00 was held on July 23, 1971. When the Board of Trustees did act, the Administrative Office under the direction and supervision of affiant immediately prepared and mailed notice of that action to all those whose applications were still being processed or whose retirement payments had not in fact commenced. These were people whose pensions could have otherwise been effective prior to July 1, 1971 and whose pensions had been approved by the Pension Approval Committee on July 15, 1971. These approvals of the Committee were up for ratification by the full Board of Trustees at the same July 23, 1971 meeting. These individuals were given an election between the earlier retirement date they had chosen with the 5% increase to come on August 1, 1971 and a change in the retirement date to the later date of July 1, 1971 with the higher $15.00 amount for all pensions effective July 1, 1971 and after."

Sutherland states, and documents submitted by defendants establish, that Or-

Trustees, bound to institute the 9 to $15 increase if it was actuarially sound because of the recommendation of the collective bargaining parties?

"A. I think that would be our duty.
 * * * * *
Deposition of Alfred A. Figone, August 23, 1973, at p. 16:

"Q. * * * Do you recall whether or not you, as a Trustee, felt bound by that recommendation of the collective bargaining parties?

"A. As a Trustee, I felt that by virtue of the actuarial data that was given to us, that it was a prudent move, yes.

"Q. But did you feel bound by the fact it was actuarially sound and the fact that the collective bargaining parties made the recommendation that you should vote on it?

"A. When I indicate they made the recommendation, I am indicating they made the recommendation that the money went in and would support these benefits.
 * * * * * "

ban Hudson was one of those persons given an election who chose to take the $15.00 unit value effective July 1, 1971. Sutherland states: "All those in a position similar to Mr. Hudson's were treated in precisely the same manner."

### III. *Summary Judgment for Defendants*

To obtain summary judgment, a party must demonstrate that there is no genuine issue of material fact and that under the uncontroverted facts it is entitled to a judgment as a matter of law. Adickes v. Kress & Co., 398 U.S. 144, 158–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Rule 56(c), Federal Rules of Civil Procedure. The moving party has the burden of conclusively showing by factual evidence "that the facts upon which [the opposing party] relied to support his allegation were not susceptibe of the interpretation which he sought to give them." First Nat. Bank v. Cities Service, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The factual material presented by a moving party "must be viewed in the light most favorable to the opposing party." Adickes v. Kress & Co., 398 U.S. 144, at 157, 90 S.Ct. 1598, at 1608, 26 L.Ed.2d 142. See also United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

Plaintiffs' complaint raises essentially five legal claims, each of which, they contend, demonstrates that the trustees' decision to increase pension benefits more for pensioners retiring on or after July 1, 1971, than for those retiring before that date was arbitrary or capricious. As to each claim, the Court finds that there is no genuine dispute as to a material question of fact and that defendants are entitled to summary judgment as a matter of law.

### A. *Union, Employer Interests*

■ Plaintiffs claim that the trustees' decision "was done for the purpose of fortifying the position of the unions with their active union member carpenters and to better the relationship between the employer groups and the active union members carpenters." They also claim that decision "grossly discriminates" against those persons retiring before July 1, 1971.

Even if the trustees had the purposes alleged by plaintiffs, their decision would not be in violation of § 186(c)(5) as arbitrary or capricious. Plaintiffs have not claimed that pensioners retiring prior to July 1, 1971, were unfairly represented by the union in the collective bargaining negotiations. They have not alleged that the union's conduct toward those pensioners was "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Since increased support of the union by its active members would be a natural consequence of a differential in benefits favoring those members, the fact of such increased support cannot itself be sufficient evidence of a violation of the trustees' duties. *Cf.*, Note, 68 Mich.L.Rev. 757, 766–767 (1969–70). A contrary view would greatly undermine the collective-bargaining process as now constructed and would conflict with "the faith of Congress in free collective bargaining between employers and their employees when conducted by freely and fairly chosen representatives of appropriate units of employees." Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. 330, at 338, 73 S.Ct. 681, at 686, 97 L.Ed. 1048. See also Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 301, 91 S.Ct. 1909, 29 L.

Ed.2d 473 (1971); Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). A purpose to fortify its strength among its active members does not imply bad faith on the part of a union. The strength of a union, and hence its ability to represent effectively all its members, including those retired, depends upon its strength in the workplace. No evidence in the record here indicates any basis for a finding of bad faith by the union in bargaining.[15] Thus, "in representing retirees in the negotiation of retirement benefits, the union would be bound to balance the interests of all its constituents, with the result that the interests of active employees might at times be preferred to those of retirees." Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 173, n. 12, 92 S.Ct. 383, 394, 30 L. Ed.2d 341 (1971).

The acceptance by the trustees of the recommendation of the collective-bargaining parties as to benefit increases and differentials is not arbitrary or capricious unless it can be shown that the interests of the beneficiaries were neglected or subverted. The trustees' decision in 1971 was based upon advice by experts that it would be actuarially sound. There is no claim or evidence that all beneficiaries were not fairly represented during the collective-bargaining negotiations or that the union was ignoring the interests of the beneficiaries and following, for instance, the personal interests of union leaders. Cf. Blankenship v. Boyle, 329 F.Supp. 1089, 1107–1110 (D.D.C.1971).

Similarly, employers may legitimately seek to strengthen their relationship with currently employed union members:

"Congress obviously contemplated payments to union welfare funds would be made by employers for the benefit of their employees, in the expectation that such payments further legitimate interests of the employers. If an individual employer establishes an individual plan for the 'benefit of the employees of such employer' his legitimate interest may well lie in confining retirement benefits to his employees." Roark v. Boyle, 141 U.S. App.D.C. 390, 439 F.2d 497, 502 (1970).

Therefore, plaintiffs could not succeed on this claim even if their allegations as to the union and employer's purposes were proven true.

Since plaintiffs have not alleged or offered evidence of unfair representation or of improper purpose behind the collective-bargaining recommendation, the Court does not find the trustees' decision grossly discriminatory or unreasonably discriminatory.[16] The fact that two employee trustees believed the recommendation by the collective-bargaining parties "obligatory" or "binding"[17] upon them if actuarially sound is neither surprising nor evidence of anything unlawful. As the Court expressed in the first section of this opinion,[18] § 186(c)(5) contemplates a close relationship between collective bargaining and the management of a trust fund formed under its aegis. Unless the uncontroverted allegations or undisputed facts show a course of conduct by the trustees clearly not "for the sole and exclusive benefit" of the trust-fund beneficiaries, the actions of the trustees in following the recommendation of the collective-bargaining cannot be held to be arbitrary and capricious.

---

15. There is some uncertainty in the record as to how and to what extent union members were consulted by the union negotiators about the pension plan terms being negotiated, but there is no indication that retired members were treated differently than active members in this respect. See pp. 199–200, supra.

16. The Agreement establishing the Pension Trust Fund prohibits trustees' decisions which are "unreasonably discriminatory under the provisions of the Internal Revenue Code, or under any other applicable law or regulation." Art. VII, Section 8, p. 20.

17. See p. 200, supra.

18. See pp. 194–198, supra.

### B. *Actuarial Soundness*

■ Plaintiffs also complain that "the actions of the trustees of raising the benefits of retired persons [those who retired on or after July 1, 1971] $6.00 per month was an abuse of authority on the part of the trustees and has placed the fund in serious danger of being depleted thus adversely affecting the plaintiffs and members of their class." They also allege that the actuaries advised the trustees of this danger prior to their decision.[19]

The facts are undisputed[20] and are completely contrary to this claim. The Trust Fund's actuarial consultants have stated that the decision did not endanger the Fund and that the trustees were never advised that it would.

### C. *Retiring Trustees*

■ Plaintiffs' third claim is that the trustees approved the higher benefits for pensioners retiring on or after July 1, 1971, in order to give higher benefits to several employee trustees who retired shortly thereafter. Four employee trustees have retired since the decision was made. Two retired five to seven months after the decision, and the other two ten to eleven months afterward.

Defendants have offered evidence of the history of the trustees' policy of differential benefit increases favoring prospective retirees.[21] They also point to the uncontestable fact that, since the decision was made on July 23, 1971, to be effective retroactively to July 1, 1971, any trustee who had not retired prior to the decision and who did retire subsequently would receive the higher monthly rate of $15.00 per credit year.

The Court finds that these facts give sufficient support to defendants' motion for summary judgment to require plaintiffs to present factual evidence which would show a genuine issue for trial. See Rule 56(e), Federal Rules of Civil Procedure. Plaintiffs, however, point solely to the fact that four employee trustees did retire after the effective date of the higher pension benefits. This fact, which is not disputed, does not support plaintiffs' claim of a violation by the trustees of their fiduciary duties. It does not, by itself, support an inference that the trustees were motivated by a desire to benefit the retiring trustees, especially when the policy basis of the differential in increases had been under consideration for nearly a decade. Because the only evidence proffered by plaintiffs of a motivation to benefit the retiring trustees would not entitle plaintiffs to a judgment as a matter of law, it is not sufficient to prevent a granting of summary judgment to defendants. First Nat. Bank v. Cities Service, 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L. Ed.2d 569 (1968); McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905–906 (9 Cir. 1968).[22]

Therefore, defendants have demonstrated that the facts are not in genuine dispute as to this claim and that under those facts they are entitled to a summary judgment that their action was not arbitrary or capricious.

### D. *Secret Information to Some Retirees*

■ Plaintiffs' fourth claim is that the trustees "secretly inform[ed] per-

19. Plaintiffs have not pursued this claim on their cross-motion for summary judgment.

20. See pp. 199–200, *supra.*

21. See pp. 198–199, *supra.*

22. Plaintiffs rely upon Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But the Supreme Court in *Poller* found that there was "no conclusive evidence supporting respondents' [the moving parties] theory." 368 U. S. 464, at 473, 82 S.Ct. 486, at 491, 7 L.Ed. 2d 458. Here the moving parties have demonstrated sufficient evidence to support their theory. In addition, in *Poller*, the Court found "substantial factual evidence" supporting the allegations of the complaint. First Nat. Bank v. Cities Service, 391 U.S. 253, 285, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Plaintiffs have failed to present substantial factual evidence here.

sons who were to retire prior to July 1, 1971, that they should wait until after July 1, 1971, to retire to receive the new benefits. This action was taken before the trustees had voted on the new increase." Defendants deny this claim and also contend that it is not material to this lawsuit. They have presented evidence that the Board of Trustees had adopted the policy (and given notice to the persons affected) of allowing those retirees whose pensions would have been effective prior to July 1, 1971, but were still being processed at the time of the July 23, 1971, meeting to elect to have their pension made effective as of July 1, 1971.[23] Plaintiffs' evidence on this issue consists of the affidavits of Curry and Kaufenberg[24] to the effect that persons *other than trustees* informed carpenters preparing to retire to postpone their decisions. They also have offered affidavits of two retirees who attest that they would have waited until after July 1, 1971, to retire if they had known of the prospective increase for future retirees.

Defendants' evidence establishes that the trustees adopted and implemented a policy of allowing some retirees to take advantage of the higher post-July 1, 1971, benefits. The Court finds this policy to have been a reasonable resolution of a difficult and thorny problem of line-drawing. Indeed, the policy recognized and softened the impact of the decision upon those whose pensions had not been finally approved at the time of the decision. Unavoidably, some individuals fell just short of this line and were not allowed to elect the higher benefits.

Plaintiffs' evidence fails to support their allegations. Since there is no genuine issue of material fact, defendants are entitled to summary judgment on this claim. First Nat. Bank v. Cities Service, 391 U.S. 253, 288–291, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); McGuire

v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905–906 (9 Cir. 1968).

### E. *Allowing Reapplications by Some Retirees*

Plaintiffs' final claim is that "in several instances * * * persons who had put in for their retirement prior to July 1, 197[1] and thus would have been entitled only to the 5% increase were allowed to withdraw their previous application and reapply after the July 1, 1971 date and receive the new and substantially higher benefits."

 Defendants' evidence here is, again, their policy of allowing certain pension applicants to elect the higher benefits. Plaintiffs have offered evidence of one person who was allowed to withdraw his application and reapply. But that evidence consists of hearsay statements by affiant Quick and as such cannot be considered with respect to a motion for summary judgment. Rule 56(e), Federal Rules of Civil Procedure. Moreover, defendants have conclusively shown that that individual was one who was allowed to elect the higher benefits.[25]

Defendants are entitled to summary judgment on this issue.

### IV. *Pendent State Claim*

 Plaintiffs' second cause of action is based entirely on state law and the pendent jurisdiction doctrine. Since defendants will be awarded summary judgment on plaintiffs' federal cause of action, there is no good reason for the Court to retain jurisdiction over this state claim. "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The sec-

---

23. See p. 201, *supra.*

24. Kaufenberg's statement on this point is hearsay and cannot be considered with respect to a motion for summary judgment.

Rule 56(e), Federal Rules of Civil Procedure.

25. See p. 201, *supra.*

ond cause of action will therefore be dismissed for lack of jurisdiction.

It is hereby ordered, adjudged, and decreed that summary judgment is granted defendants on plaintiffs' first cause of action and that judgment be entered for defendants as to that cause of action.

It is hereby further ordered, adjudged, and decreed that plaintiffs' motions for summary judgment on both causes of action are denied.

It is hereby further ordered, adjudged and decreed that plaintiffs' second cause of action is dismissed for lack of jurisdiction.