[No. 31768. Department Two. December 27, 1951.]

ART YEAGER, *Appellant,* v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 313 *et al., Respondents.*[1]

[1]Reported in 239 P. (2d) 318.

*Eisenhower, Hunter & Ramsdell*, for appellant.

*Bassett & Geisness*, for respondents.

HAMLEY, J.—Art Yeager brought this action to enjoin defendants from continuing plaintiff's name on the union's unfair list, and to recover monetary damages.

Yeager is engaged in the business of grading, excavating and supplying gravel and top dirt in Tacoma and Pierce county. He employs men and operates trucks and other heavy equipment. For several years he has been an "owner-operator" member of Local 313 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The term "union" will be used to designate Local 313. Harry Satterlee is secretary-treasurer of the union. Francis Chapin is its business agent, and Paul Gomsrud is a member of its executive board.

Prior to the time this controversy arose, Yeager employed only members of the union as truck drivers. This

was in conformity with the by-laws of the union relating to the obligation of owner-operator members. In November, 1949, Yeager became dissatisfied with one of his union truck drivers and discharged him. It is conceded that Yeager had the right to discharge this employee, and the union claims no grievance on this score. It was Yeager's subsequent act in employing a nonunion truck driver which caused the trouble resulting in this litigation.

The new driver was Frank Hobaugh, a disabled veteran. For some time prior to November 15, 1949, Hobaugh had been employed by Yeager doing yard and garden work and odd jobs. On that date Yeager employed him as a truck driver, at union hours and wages, to replace the union driver who had been discharged. Yeager knew that Hobaugh was not then a member of the union, and informed the latter that it would be necessary for him to join. Yeager assumed that he was following approved custom and procedure, and that Hobaugh would have no difficulty in gaining admission to the union. Hobaugh, however, failed to apply for union membership at that time.

Shortly afterwards Chapin stopped Hobaugh at his work, and informed him that he should not drive. The latter said he intended to continue, and asked about joining the union. Chapin then told Hobaugh, and later Yeager, that Hobaugh could not join. Hobaugh was given the same information when he went to union headquarters to apply for membership shortly after his talk with Chapin. The following January, Satterlee and Chapin again discovered Hobaugh driving a truck for Yeager, and there was some discussion between the three men.

Hobaugh then went to union headquarters two more times in an effort to join the union, but his application was not accepted. The reason given was that the membership would not act favorably on the application because the union had a hundred unemployed members, including many disabled and partially disabled veterans. The refusal to accept Hobaugh's application was also communicated to Yeager and the same reason given.

Yeager continued to employ Hobaugh. Charges against Yeager were filed with the union by Chapin on March 21, 1950. These charges made reference to specific provisions of the union's by-laws and the International Brotherhood's constitution relating to the obligation of an owner-operator to employ only union members. The charges were aired at a meeting of the union, and were later considered at a meeting of the Tacoma Building Trades Council. Yeager attended both of these meetings. Thereafter, on April 25, 1950, Yeager tendered his resignation from the union. The union accepted this resignation on May 2, 1950.

On May 12, 1950, the union requested the Tacoma Central Labor Council to place Yeager on the "unfair" list. This body apparently acted favorably on the request. Commencing with the next issue after May 12th, Yeager's name was included in a list under the heading "We Do Not Patronize," published in the Labor Advocate. His name has been so published in succeeding issues since that time. The Labor Advocate is a paper published in the interests of union labor by an incorporated company, in the ownership and control of which all labor unions participate. The paper is widely circulated among union organizations and members in Tacoma, which city is practically one hundred per cent union organized.

Since being placed on the unfair list, Yeager has, for the most part, been unable to employ members of defendant union, or of unions affiliated with defendant union. It has also been impossible for Yeager, except in the case of Hobaugh, to fulfill his needs by hiring nonunion workmen. The result has been that Yeager has lost profitable contracts, including a job at Fife in which the profit would have been seven hundred fifty dollars. The indications are that this condition will continue as long as Yeager's name remains on the unfair list.

Upon these facts, the trial court dismissed the cause of action with prejudice. Plaintiff has appealed. The first question presented by the assignments of error is whether

the object sought to be accomplished by respondents is lawful.

Respondents take the position that they are only trying to enforce the union's contract with appellant, whereby he agreed to hire only union members. Article VI of the union's by-laws, relating to owner-operators, reads in part as follows:

"Section 1. Any owner-operator may be allowed to hold membership in this local union provided he hires and employes none but members of this local union for employment in this locality, and conforms to the prevailing rate of wages, hours, and working conditions. . ."

■ The general rule is that the constitution and by-laws of an organization form a contract between the association on the one hand, and its members on the other. *Furniture Workers' Union, etc. v. United Brotherhood of Carpenters & Joiners of America*, 6 Wn. (2d) 654, 663, 108 P. (2d) 651. Appellant contends, however, that these particular by-laws constitute only a condition of continued membership for an owner-operator. From this it is argued that these by-laws do not obligate appellant to employ union men after appellant has ceased to be an owner-operator member of the union.

■■ This is unquestionably true. However, these by-laws were binding upon appellant in November, 1949, and for several months thereafter, and until appellant's resignation April 25, 1950. During all of this time appellant was employing a nonunion truck driver, contrary to the by-laws in question.

Appellant cannot, by resigning from the union after breaching his contract or condition of membership, forestall respondents from seeking redress in the manner here pursued. Were this the rule, such special members could violate the by-laws of a union with impunity, safe in the knowledge that, if the violation were discovered, any counter measures invoked by the union could be avoided by merely withdrawing from membership. Even if this contention were otherwise meritorious, we would be con-

strained to hold that an employer who seeks protection from union action made reasonably necessary by his own breach of duty, does not approach the equity court with clean hands.

Appellant asserts that respondents' object was to compel the discharge of appellant's nonunion employee, so that a union member could be employed in his place. It is argued that this is an unlawful object, in view of the policy declaration in the labor disputes act (Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3]), as applied in several decisions of this court. It is further contended that the object is particularly obnoxious in this case because respondents are maintaining a closed union.

■ In substance, the by-laws in question constituted a closed shop agreement, effective while appellant was a member of the union. It was an agreement entered into voluntarily by appellant at a time when he employed only union members. Contracts of this kind are commonplace and not unlawful under the laws of this state. The only statutory provision which has any possible bearing on this is the declaration of policy contained in the labor disputes act of 1933, referred to above. This policy declaration has never been held to prohibit closed shop agreements entered into voluntarily and exerting no compulsion upon the then employees of the contracting employer. On the contrary, a contract of this kind was recognized and given effect by this court in *Marvel Baking Co. v. Teamsters' Union, etc.*, 5 Wn. (2d) 346, 105 P. (2d) 46. See, also, *Edwards v. Teamsters Local Union No. 313*, 8 Wn. (2d) 492, 113 P. (2d) 28.

*Gazzam v. Building Service Employees Int. Union, Local 262*, 29 Wn. (2d) 488, 188 P. (2d) 97, 34 Wn. (2d) 38, 207 P. (2d) 699, 339 U. S. 532, and *Ostroff v. Laundry & Dye Works Drivers' Local No. 566*, 37 Wn. (2d) 595, 225 P. (2d) 419, cited by appellant, are not in point. In neither of these cases was the union seeking to enforce a closed shop agreement voluntarily entered into by the employer. *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P. (2d) 397, is likewise inapplicable. There the employer and the picket-

ing union were seeking to coerce the employees to discontinue their affiliation with one union and join another.

In the instant case, there would be no nonunion employee to discharge were it not for the fact that appellant violated his contract with the union. It was a situation of his own creating. As before indicated, we do not believe appellant can avoid the consequences of this breach by resigning from the union at a time when he was violating that contract. If it is wrongful for the union to maintain a closed union at the same time it insists upon a closed shop, it is Hobaugh who is aggrieved, and not appellant.

Appellant makes the further contention that, under the constitution of the International Brotherhood and the by-laws of Local 313, Hobaugh had the right to join the union; that these constitutional and by-law provisions were part of the contract between appellant and the union; and that appellant therefore had a right to rely upon these provisions and assume that Hobaugh would be accepted in the union. Appellant asserts that, since the union failed to abide by this contract provision, Yeager was released from his obligation to hire only union truck drivers.

Article II of the union's by-laws, governing admissions to membership, plainly indicates that the union reserves the right to accept or reject such applications. This is shown by the italicized portion of Article II, quoted below:

" . . . No person or persons shall be admitted to membership by initiation or transfer unless actually working at the craft *and accepted by the union.* . ."

Appellant, however, relies upon the following paragraphs of Article II, § 2, of the constitution of the International Brotherhood:

"(a) Any person 18 years or over, of good moral character, employed in the craft or the various employments over which this International has jurisdiction, shall be eligible to membership in this organization. . . .

"(c) If, however, any local union can prove to the satisfaction of the General President or the General Executive Board that the admission of such individuals would be detrimental to the welfare of the local union, it may pre-

sent such facts to the General President or the General Executive Board for authority to refuse to accept such persons as members. The General President shall consider all the facts and circumstances submitted by the local and render a decision in the matter, which shall be binding on such local."

It will be observed that § 2(a) refers to eligibility for membership. The term "eligible," as used in this manner, means competent to be chosen. *State ex rel. Reynolds v. Howell,* 70 Wash. 467, 126 Pac. 954. In *Washington Branch of American Ass'n of University Women v. American Ass'n of University Women,* 79 F. Supp. 88, affirmed 175 F. (2d) 368, it was held that where the national by-law described persons of certain educational requirements as being "eligible" to membership, the branch association had the right to exclude, on other grounds, persons who met the eligibility requirements of the national by-laws. Hence, although Hobaugh was eligible for membership under § 2(a), quoted above, this provision, standing alone, did not entitle him to membership in Local 313 as a matter of right.

Section 2 (c), quoted above, provides the method to be followed if the local union desires to exclude applicants who are otherwise eligible. This procedure was not followed in connection with the refusal to accept Hobaugh's application. It may be that Hobaugh is aggrieved by such failure. This we do not decide. But it does not seem to us that this procedural lapse constitutes a substantial breach of the contractual arrangement between appellant and the union. The correlative duties and obligations between these two are mainly those set out in Article VI of the union by-laws, entitled "Owner-operators." The remaining by-laws and the constitution of the International Brotherhood relate, for the most part, to the general membership other than the special class of members dealt with in Article VI.

When appellant employed Hobaugh he knew the latter was not a union member and had not even applied for membership. Such employment therefore constituted a breach by appellant of his contract with the union. Up to that time

there had been no failure by respondents to follow the constitutional procedure in question, nor even any opportunity to invoke such procedure. It was not until some time later, after being stopped by Chapin, that Hobaugh made any effort to join the union. There is no indication that appellant relied upon respondents' procedural failure, which then occurred, as a basis for continuing Hobaugh, rather than a union driver, on the payroll. In all likelihood appellant did not even know of that failure until this litigation arose.

We are therefore of the view that appellant is not excused from his breach of Article VI of the union by-laws by reason of the union's failure to thereafter follow the procedural provisions of the constitution of the International Brotherhood, in refusing to receive Hobaugh's application.

■ We conclude that the object sought to be accomplished by respondents in placing appellant's name on the unfair list is lawful. It is therefore unnecessary for us to consider respondents' further contention that, even if such object is unlawful, the placing of an employer's name on an unfair list is protected by the free speech guarantee, and may not be enjoined.

The decree is affirmed.

HILL, GRADY, FINLEY, and OLSON, JJ., concur.