Oliver Sidney PULIS, Appellant,

v.

The UNITED STATES ELECTRICAL
TOOL COMPANY, a corporation, et
al., Appellees.

No. 48216.

Supreme Court of Oklahoma.

March 1, 1977.

Gary F. Duckworth, Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, Oklahoma City, for appellant.

Jack R. Durland, Jr., Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for appellee, The United States Elec. Tool Co.

DAVISON, Justice.

Involved in this appeal is an action brought by appellant, Oliver Sidney Pulis, to recover damages for personal injury allegedly caused by a defective portable drill. The action was brought against several co-defendants, one of which was the United States Electrical Tool Company, an Ohio corporation founded in 1968.

The trial court sustained a motion for summary judgment made by the United States Electrical Tool Company, and the Court of Appeals, Div. 1, reversed the decision of the trial court. Appellee, the United States Electrical Tool Company, has asked this Court to grant certiorari and review the decision of the Court of Appeals.

The undisputed facts before the trial court at the time it decided the motion, demonstrated that United States Electrical Tool Company, from the time of its incorporation on August 19, 1968, has never engaged in the sale of portable equipment, including the type of portable drill describ-ed in plaintiff's petition, and that the defendant had no contact, control or possession of the drill and bit described in the petition. However, the undisputed facts in the record indicate that the drill in question was manufactured, distributed, and sold in the course of business during the year 1945, by a previous corporation also named United States Electrical Tool Company, from which the present defendant purchased most of its physical assets, including the right to the name "United States Electrical Tool Company."

The general issue presented is whether a new corporate entity is liable for the debts and liabilities of an old corporate entity from which the new entity purchased assets.

The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor. Exceptions to the rule are: (1) Where there is an agreement to assume such debts or liabilities (2) Where the circumstances surrounding the transaction warrant a finding that there was a consolidation or merger of the corporations, or (3) that the transaction was fraudulent in fact or (4) that the purchasing corporation was a mere continuation of the selling company. *Coline Oil Corporation v. State*, 184 Okl. 545, 88 P.2d 897 (1939), *Burkholder v. Okmulgee Coal Co.*, 82 Okl. 80, 196 P. 679 (1921), and *Union Coal Co. v. Wooley*, 54 Okl. 391, 154 P. 62 (1916). Also see Sec. 7122 Vol. 15, Fletcher's Cyclopedia of the Law of Private Corporations.

The factual circumstances surrounding United States Electrical Tool Company's acquisition of the old corporation's assets do not even suggest the possible existence of a merger, consolidation or fraud. Nor do the facts indicate that there was an agreement to assume any debts and liabilities, although when asked a legal question, which was objected to, the President of United States Electrical Tool Company indicated that he would say he would warrant the

tools of the older corporation which had been sold.[1]

In reversing the summary judgment granted by the trial court, the Court of Appeals held that the new corporate entity was "merely a continuation of the old entity." While we reach the same result arrived at by the Court of Appeals, the setting aside of the summary judgment, we do not agree with that court's analysis of the case.

The record before the trial court strongly suggested that the new corporation was not a mere continuation of the old corporation. Mr. Carl Huddleston, President of the new corporation from its inception, testified that he and a Mr. Charles Messmer formed a company named Summit Industries and that it was their intention to manufacture grinding, buffing and polishing equipment. He further testified that their intention was to start an entire new company from scratch, but when they learned that the old United States Electrical Tool Company was for sale, they made an offer to buy and did purchase certain assets of the company, including raw materials, equipment, certain records, patents, and the name, "United States Electrical Tool Company," and other assets. The contract in which Summit purchased the assets from the old corporation provided that: " * * * Buyer is not purchasing the corporation known as United States Electrical Tool Company, but merely the items listed in Schedule 'A' * * *."[2] After Summit Industries had purchased what constituted the majority of the old corporation's physical assets, the old corporation under its new name, Fort Mitchell Tool Company, continued to supply parts for the portable equipment it had manufactured and sold in the past. Huddleston also testified that to his knowledge, the Fort

1. Mr. Huddleston's statement was in response to a question involving contract interpretation. Before making the statement, Mr. Huddleston indicated that being of legal nature, the only thing he could say as to the meaning of the contract was spelled out in the contract, that the new company accepted no liabilities or assets of the old company and that he could not speak for those who were parties to the contract. As these contract interpretation questions were objected to, and as the statements were so qualified, we will give no effect to them.

2. "EXHIBIT 'A'

"1. Name, The United States Electrical Tool Company insofar as and as fully as Seller has the right to so transfer.

"2. Copyrights, Trade Marks, Name Plates, if any.

"3. Patents, Licensing Agreements, if any. (Note: As to items 2. and 3. the Seller does not warrant that the Name, Patents, Copyrights, Trade Marks, or Licensing Agreements are valid and usable, but transfers only whatever right, title and interest the Seller has in and to such items.)

"4. Catalogs, Sales Literature, Stationery, Purchase Order, and Invoice Forms and all printed matter pertaining to U.S.E.T. Co. & cabinets.

"5. All Sales Records, User Lists, and the Cabinet in which they are contained, as used in the Sales Department.

"6. Engineering Drawings and all Engineering Records and all Serial Number Books; Cabinets that hold Engineering Tracings used in the Engineering Department, one Blue Print Machine (Brunning Model 300), Drafting Machine and Drafting Board, Layout Table, Suppliers Catalogs and two Filing Cabinets in which they are contained.

"7. Cost Records, Pattern Records, Purchasing record and records of Past Purchases and Cabinets which house these records.

"8. All inventory to include raw materials, purchased items in stock, work in process, all completed machinery and machined parts in stock, except all portable tools and related parts and all raw materials, purchased items in stock, finished goods, work in process, completed machinery and machined parts in stock referring to such portable tools and further excepting purchased six to ten inch bench grinders.

"9. All steel and steel racks, all shelving in the stock area, the paint booth and two spray guns used in connection therewith.

"10. Three static balancers, one portable balancer IRD, two tachometers and one stretac tachometer, drills and taps peculiar to the grinding manufacturing, tooling, fixtures and patterns and gages peculiar to the grinders, one 440 volt transformer, one dial indicator and all patterns connected with the business of United States Tool Company with the exception of those connected with the manufacturing of portable tools.

"11. Ten skids and one hand lift.

"12. One shop desk, metal foremans.

"s/ William A. Busemeyer
"s/ Charles J. Messmer"

Mitchell Tool Company was still in existence.

These facts strongly suggest that the old and new corporation were separate entities, both of which existed and functioned after the sale of assets, suggesting that the new corporation was not a mere continuance of the old corporation. In its decision, the Court of Appeals suggested that because the business operation of the old corporation continued without major changes, that a continuation of the old corporation exists. The test is not the continuation of the business operation, but the continuation of the corporate entity. *Forest Laboratories, Inc. v. Pillsbury Company,* 452 F.2d 621 (7th Cir. 1971); *West Texas Refining & D. Co. v. Commissioner of Int. Rev.,* 68 F.2d 77 (10th Cir. 1933); *Mitford v. Pickett,* 363 F.Supp. 975, (D.C.Ill.1973); and *Lopata v. Bemis Company, Inc.,* 383 F.Supp. 342 (E.D.Pa.1974). In *Kloberdanz v. Joy Manufacturing Company,* 288 F.Supp. 817 (D.Colo.1968), the court stated:

> "Nor can the buyer be said to be a mere continuation of the seller. Web-Wilson, Inc. continued to exist after the sale, and there was no common identity of stock, directors, officers or stockholders between Joy and Web-Wilson. This exception [mere continuation of a corporation] covers a *re-organization of a corporation.*" [Emphasis added]

Also see Sections 7122 and 7205, Vol. 15, Fletcher's Cyclopedia of the Law of Private Corporations.

Although the continued existence of the seller corporation after the sale is a strong indication that the transaction did not result in the mere continuance of the seller corporation, the facts before the court were not conclusive, and did not totally negate the possibility of the transaction being a mere reorganization of the seller corporation, for the mere *de jure existence* of the seller corporation after the sale is not conclusive; the existence must be shown to be a *de facto existence.* See Section 7329, Vol. 15, Fletcher's Cyclopedia of the Laws of Private Corporations, and *Berthold v.*

*Holladay-Klotz Land and Lumber Co.,* 91 Mo.App. 233 (1901).

In its opinion, the Court of Appeals suggested that the mere continued existence of a seller corporation after a sale of assets, *even if a de facto existence,* does not alone free a buyer corporation from the liabilities of the seller corporation. Rather, the court suggested that the buyer corporation is freed from liability only when the seller corporation maintains sufficient assets for the payment of claims against it.

In making this suggestion, the Court of Appeals relied upon *Utley v. Standard Magnesium & Chemical Company,* Okl., 478 P.2d 953 (1971). In *Utley,* a corporation reorganized, creating a new corporation which was merely a continuation of the old corporation. During a short transition period, both an old and new corporation existed simultaneously. The sole purpose for the seller's existence during the transitional period was to wind up and settle its affairs. Our holding in *Utley* stands for the proposition that when a corporate entity reorganizes, creating a new corporation which is merely a continuance of the old corporation, that during a transitional period in which the two corporations exist, the buyer corporation is not liable for any debts or liabilities of the seller corporation, which it did not assume, if, and only if, the seller corporation has sufficient assets for the payment of its debts and liabilities. Our holding in that case is not applicable to situations in which two corporations exist in fact after a sale of assets, and it does not stand for the proposition that a "mere continuance of a corporation" exists in all cases unless the seller corporation has sufficient assets for the payment of its debts and liabilities.

Although we disagree with the analysis used by the Court of Appeals, that court was correct in setting aside the summary judgment granted by the trial court. While the facts before the trial court demonstrated that the seller corporation continued to exist and "function" after the sale, these facts do not preclude the possibility of

the buyer corporation being a mere continuation of the seller corporation. The testimony indicating that the seller corporation continued to function after the sale left much to be desired—the only indications in the record that the company continued to function after the sale are statements that the seller corporation continued to supply spare parts for portable equipment. The record was void of any specific information about the seller corporation's business activities after the sale. The record did not indicate who managed the corporation after the sale, or how many employees it had, how active its business was, where it was located, what assets it possessed, who owned it, or how long it remained in business. Under the facts in the record, it is possible that after the sale of the seller corporation, it existed *in form only,* with little or no actual function. Because the record did not contain specific information regarding the seller corporation's business activities after the sale, we cannot say, as a matter of law, that appellee conclusively negated the possibility that the buyer corporation was a mere continuance of the seller corporation.

Accordingly, we affirm the results reached by the Court of Appeals, although we disagree with the rationale employed by that court.

Certiorari granted; opinion of the Court of Appeals withdrawn; decision of the trial court reversed and remanded for further proceedings.

All the Justices concur.