[No. 44959. En Banc. January 4, 1979.]

CULINARY WORKERS AND BARTENDERS UNION, LOCAL No. 596, HEALTH AND WELFARE TRUST, *Respondent*, v. GATEWAY CAFE, INC., ET AL., *Appellants*, HUBBARD & BURNS, INC., P.S., *Respondent*.

CULINARY WORKERS AND BARTENDERS UNION, LOCAL No. 596, *Respondent*, v. GATEWAY CAFE, INC., ET AL., *Appellants*.

354

*James R. Dickens* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S.*), for appellants.

*Jack R. Burns* (of *Hubbard & Burns, Inc., P.S.*) and *Lawrence Schwerin* (of *Hafer, Cassidy & Price*), for respondents.

HAMILTON, J.—Restaurant Employees, Bartenders and Hotel Service Employees Welfare and Pension Trust, formerly Culinary Workers and Bartenders Union No. 596 Health and Welfare Trust (respondent), filed suit against Gateway Cafe, Inc., and the Larsons and Clevens (appellants) individually for unpaid contributions to the trust fund. This action was consolidated with a declaratory judgment action filed by the Culinary Workers and Bartenders Union, Local No. 596 (union). The union sought a determination of the validity of an agreement signed by the Restaurant Association of the State of Washington (association) on behalf of and binding appellants.

The trial court bifurcated the proceeding, hearing first the declaratory aspect of the consolidated actions. After conclusion of this hearing, the trial court declared the agreement binding and enforceable against appellants, awarded attorney fees, and ordered a trial on the issue of the amount due respondent trust fund. The declaration of enforceability constitutes the basis of this appeal, which we agreed to hear.

We reverse the declaratory judgment in part, affirm in part, and remand for further proceedings.

The dispute, engendering a goodly amount of conflicting testimony, centers around events which, at the outset, require a summarized explanation. Appellants worked for a

number of years acquiring and building a business called Gateway Cafe, Inc. (Gateway). On April 25, 1972, they sold their accumulated interests to a person named Munroe pursuant to a stock purchase agreement. At the time of the sale, Gateway was not unionized. On November 21, 1972, Munroe signed, on behalf of Gateway, an agreement which required him to make contributions to an employees' trust fund. Munroe's agreement was to be in effect until 1975.

In January of 1973, the Internal Revenue Service closed Gateway for nonpayment of taxes. Munroe forfeited his interest to appellants. They were then faced with the task of deciding what course of action to follow. After some consideration, they decided to reestablish the Gateway Corporation, pay back taxes, and operate it under a new name.

Meanwhile, respondent initiated a lawsuit to recover payments due to the trust fund under its agreement with Munroe. It subsequently obtained a *default* judgment against Gateway for over $6,000. Respondent then took steps to collect the judgment, which in turn led to negotiations with appellants, who were in control of Gateway, regarding satisfaction of the default judgment. By a letter dated December 6, 1974, appellants' attorney communicated a settlement offer to respondent. Under the terms of the proposed settlement, appellants were to sign a detailed agreement providing for substantial employee benefits. In addition, appellants were to direct all employees to join the union; those who failed to join the union were to be discharged. Appellants were to agree to recognize the union as bargaining agent for all of Gateway's employees, and irrevocably assign their negotiation rights as employers to the association. Finally, the terms of the settlement required appellants to pay $2,000 into the pension trust.

Appellants executed the agreement, assigned their negotiation rights to the association, and paid respondent $2,000. Thereafter, they did not perform as agreed. First, they failed to adhere to their agreement to make contributions into the employees' trust. Then, appellants refused to negotiate with the union and stated they were revoking the

assignment of negotiation rights which they had given, irrevocably, to the association. Thus making it clear they did not intend to honor their agreement, appellants retained new counsel who took steps to establish a new corporation called Bypass Sales, Inc. (Bypass). Gateway's corporate status, which was delinquent as a result of Munroe's forfeiture, was remedied by the filing of an annual report with the Secretary of State. Bypass was then officially formed, and Gateway was dissolved.

Just prior to Gateway's dissolution, respondent filed a new lawsuit against appellants to recover unpaid contributions to the trust. The union then filed the declaratory judgment action seeking determination as to the validity of the agreement under which appellants were to recognize the union and contribute to the trust fund. The two actions were consolidated for trial with the bifurcated result and direct appeal we have already noted.

Appellants raise a number of issues by their appeal. They contend that: (1) the trial court abused its discretion in permitting an amendment of the pleadings; (2) respondent violated a fiduciary duty owed the trust beneficiaries; (3) the challenged agreement was obtained through duress; (4) the settlement offer was unauthorized; (5) as mere successor employers, they cannot be responsible for Munroe's agreement; (6) they did not bind Gateway; (7) they have no personal liability; (8) Bypass is not liable; (9) they revoked the assignment to the association; (10) the union is not the employees' agent, thus the agreement for the employees' benefit is invalid; (11) public policy warrants setting aside the agreement; (12) the award of attorney fees was an abuse of discretion.

We have considered and will discuss each of these issues in order; however, we find no merit in any of appellants' contentions, except their assertion that a portion of the agreement is violative of public policy.

First, appellants argue they were "potentially" prejudiced by a procedural ruling of the trial court which permitted amendment of respondent's pleadings. The amendment

merely reflected a merger of two unions. Court rules, specifically CR 15, permit such amendments. Appellants have not demonstrated they were prejudiced by the amendment. Since they failed to do so, we find no error in the trial court's ruling allowing amendment.

Next, appellants argue respondent violated its fiduciary duty to the trust beneficiaries in negotiating a settlement which collaterally benefitted a labor union. They claim collateral benefits to unions are prohibited under applicable federal law since trustees must act for the sole and exclusive benefit of the trust. Appellants direct our attention to two statutes: the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 141 *et seq.* (originally enacted as Act of June 23, 1947, ch. 120, 61 Stat. 136), and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* (originally enacted as Act of September 2, 1974, Pub. L. No. 93–406, 88 Stat. 829).

We have assumed, arguendo, that a finding of violation of fiduciary duty would warrant setting aside the agreement.[1] With this assumption in mind, we now examine the above-referenced statutes.

The LMRA makes it unlawful for an employer to make payments to employees or representatives of employees *except* as specifically authorized by law. Among the authorized exceptions are payments made:

> (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents):

29 U.S.C. § 186(c)(5).

---

[1] Both statutes to which appellants have directed our attention provide specific criminal and civil penalties for breaches of trust by fiduciaries. The appellants would urge that an additional penalty—voiding an agreement—is appropriate under these statutes; however, they have not provided us with authority to this effect. We need not address the appropriateness of the remedy they urge since we have found no violation of fiduciary duty.

We note that the LMRA, of which the above exception is a part, was intended to prohibit employers from tampering with the loyalty of union officials, and to prevent disloyal union officials from giving monetary tribute to employers. *Lugo v. Employees Retirement Fund of the Illumination Prods. Indus.,* 388 F. Supp. 997 (E.D.N.Y. 1975); *United States v. Ryan,* 225 F.2d 417, 426 (2d Cir. 1955) (L. Hand, C.J., dissenting), *rev'd,* 350 U.S. 299, 100 L. Ed. 335, 76 S. Ct. 400 (1956).

Section 186(c)(5) is directed against the payment of *funds* to persons other than trust beneficiaries and against the use of funds supplied by one employer for the benefit of employees of another. *Bey v. Muldoon,* 223 F. Supp. 489, 495–96 (E.D. Pa. 1963), *aff'd per curiam,* 354 F.2d 1005 (3d Cir. 1966), *cert. denied,* 384 U.S. 987, 16 L. Ed. 2d 1004, 86 S. Ct. 1888 (1966). Where the purpose and effects of a transaction are to benefit the union and penalize employees, the transaction is not solely for the employees' benefit, and it is violative of the statutory prohibition. *See Insley v. Joyce,* 330 F. Supp. 1228, 1234 (N.D. Ill. 1971). Thus, though trustees are held to high standards under the LMRA, in the absence of a substantial showing that trustees have either paid money to employers or have seriously neglected or subverted the interests of trust beneficiaries, courts should not trivially set aside their actions. *Toensing v. Brown,* 374 F. Supp. 191, 198 (N.D. Cal. 1974), *aff'd,* 528 F.2d 69 (9th Cir. 1975); *Lee v. Nesbitt,* 453 F.2d 1309, 1311 (9th Cir. 1972).

The settlement agreement in the instant case resolved an existing employer trust fund dispute, avoided possible employer insolvency, and resulted in the continuation of the trust *for the employees' benefit.* Ultimately, the agreement requiring continued contributions to the trust could conceivably further the actuarial soundness of the trust fund. We do not believe an incidental advantage to the union, assuming such an advantage materializes, would be sufficient to defeat this benefit and make the required substantial showing of trustee misconduct. *See Lugo v.*

*Employees Retirement Fund of the Illumination Prods. Indus., supra.*

Appellants contend, however, that under *Blankenship v. Boyle*, 329 F. Supp. 1089 (D.D.C. 1971), opinion supplemented, 337 F. Supp. 296 (D.D.C. 1972), any incidental or collateral benefit resulting to a union warrants finding violation of fiduciary duty. We disagree. Appellants have taken the holding of *Blankenship* out of its factual context. In that case, the court did in fact enjoin trustees from operating a fund in a manner designed in whole or part to afford collateral benefits to the union. The injunction, however, was clearly based on specific practices found to be breaches of trust, such as: (1) arrangements between the fund and union that served to the disadvantage of beneficiaries; (2) accumulation of excessive amounts of cash; and (3) recommendations that the fund invest in securities in which the union had an interest. The language in *Blankenship* referencing collateral benefits to the union was not intended to be descriptive of the *general* obligations of trustees under section 186(c)(5). *See Blankenship, supra* at 1106 and 1113. The trustees were simply held to the usual common–law fiduciary standards. *See Blankenship, supra* at 1094.

Further, we observe that had Congress wished the total independence of trustees for which appellants contend, it easily could have acted to prohibit a person from serving both as a union representative and as a trustee. But it did not do so. Rather, Congress required both employee and employer representatives to participate in administration of the trust fund. 29 U.S.C. § 186(c)(5)(B). Thus, some degree of collateral interest on the part of the respective trustees was not totally ruled out.

In this case, while respondent, acting on behalf of the trust, had some degree of collateral union interest, the facts do not demonstrate respondent acted impermissibly in administration of the trust. The terms of the agreement and its effects, do not operate in any way to penalize beneficiaries of the trust. Accordingly, we reject appellants'

argument that respondent violated the fiduciary duties imposed by section 186(c)(5).

Our examination of ERISA has likewise led us to reject appellants' contention that respondent has violated fiduciary duty standards under that law.

ERISA, like the LMRA, states:

**(a) Prudent man standard of care**

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

29 U.S.C. § 1104(a).

The situations which present a fiduciary with problems of reconciling obligations under ERISA with obligations to an employer, union, and others are numerous. Congress attempted to address the problems of divided loyalties by prohibiting a fiduciary from acting in any transaction involving a pension plan on behalf of a party whose interests are adverse to the interests of the plan, or participants, or beneficiaries. 29 U.S.C. § 1106(b)(2). Significantly, however, it has also provided that nothing in section 1106 shall be construed to prohibit a fiduciary from serving as such in addition to being an officer, employee, or representative of a party in interest. 29 U.S.C. § 1108(c)(3). Thus, as we noted in discussing the LMRA, under ERISA some degree of collateral interest is permissible.

■ In light of this, and the specific application of the prudent person rule found in section 1104(a)(1)(B), we do not believe a finding of violation of fiduciary duty is war-

ranted in situations, such as the instant case, where there is no showing that the fiduciary's collateral interest impaired a trust fund's operation or a beneficiary's interest.

■ We next consider appellants' contention that the agreement was procured through duress and thus they are not bound by its terms. In order to substantiate a claim of duress, appellants were required to prove that wrongful and oppressive conduct or acts on the part of respondent caused them to execute the challenged agreement. Mere financial pressure which worked to bring about an agreement is insufficient to establish economic duress or business compulsion. *Puget Sound Power & Light Co. v. Shulman,* 84 Wn.2d 433, 526 P.2d 1210 (1974); *W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir. 1957). *See* 13 S. Williston, *Contracts* § 1606 (3d ed. W. Jaeger 1970). Generally, circumstances must demonstrate a person was deprived of his free will at the time he entered into the challenged agreement in order to sustain a claim of duress. *Whitman Realty & Inv. Co. v. Day,* 161 Wash. 72, 77, 296 P. 171 (1931).

■■ In appellants' case the trial court's findings of fact reveal that there was a default judgment against Gateway; appellants sought and obtained legal counsel regarding their liability for this judgment; and, after considering appellants' potential liability, it was appellants' counsel who proposed a compromise settlement of the default judgment. The compromise consisted in part of the challenged agreement. The trial court's findings are supported by substantial evidence, and we accept them as verities. *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978); *Rutcosky v. Tracy,* 89 Wn.2d 606, 574 P.2d 382 (1978); *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 570 P.2d 1035 (1977). They establish that appellants had counsel and through counsel proposed the challenged agreement. In light of this, their claim of duress lacks merit.

Similarly, we conclude appellants' claim that their attorney proposed the above settlement without authorization is

meritless. The trial court heard both appellants' testimonies and the testimony of their counsel. It weighed these testimonies and found that appellants authorized the settlement. The record contains substantial evidence upon which such a finding could be made, and we will not disturb it on appeal. *Brommers, supra* at 199.

Appellants next argue that they have no liability, since the initial agreement on which the default judgment was based was executed by Munroe, a previous employer. They contend they are successor employers and, as such, are not bound by a previous employer's agreements. While the law relative to the obligations of successor employers might be applicable were we addressing appellants' liability directly under the agreement signed by Munroe, we fail to see its applicability under the present facts. Appellants, in compromise of a disputed default judgment, entered and signed a new, separate agreement dated February 13, 1975. By the terms of that agreement, they assumed certain obligations which respondent claims have not been fulfilled. Their liability is not predicated upon successorship to the earlier Munroe agreement, but rather upon an agreement they personally executed in February 1975. Thus, successorship is irrelevant, and that doctrine affords appellants no relief from the terms of the challenged agreement.

Next, appellants attempt to avoid Gateway's corporate liability by urging that they assumed management of Gateway as mere creditors. They submit they could not, as creditors, effectively execute the challenged agreement in the capacity of corporate officers. Thus, they contend Gateway has no corporate liability.

The evidence does not support this contention. The stock purchase agreement under which Munroe bought Gateway provided appellants the right, in the event of default, to enter and take possession of all corporate property. Notably, the stock purchase agreement did not give appellants a security interest in the property, but rather the right to

*forfeit* Munroe's interest and *terminate* the purchase.[2] Under the stock purchase agreement the only capacity appellants could assume upon default was that of *corporate owners.*

Further, appellants' actions clearly evince their intention to reclaim the business for themselves and not for the benefit of creditors generally. They assumed control of *all* corporate assets and selectively paid corporate debts as it was necessary to reestablish business. They also paid business license fees and taxes, and filed a corporate report with the Secretary of State. In the report they named themselves as Gateway's officers and directors.

We also note that when appellants signed the challenged agreement they executed an addendum thereto "individually, *and on behalf of the corporation*". (Italics ours.) The record therefore reflects appellants undertook action on behalf of the corporation and represented themselves as its officers and directors. We believe the trial court's findings and conclusions regarding Gateway's corporate liability are amply sustained. Accordingly, we affirm Gateway's liability.

The trial court also found appellants personally liable for performance of the terms of the agreement. Further, upon the dissolution of Gateway and the incorporation of Bypass, the trial court held that Bypass became liable for Gateway's corporate obligations under the agreement. Appellants contend that responsibility for performance, if any, was solely the corporate responsibility of Gateway. They argue that at

---

[2]"14. If there should be a default by Purchaser in the payment of this Agreement, or should the corporation be in default of any bills, debts or taxes in excess of $1,000.00 in total, and should Purchaser fail to cure any such default within 30 days written notice from Seller, delivered personally to Purchaser or sent by Certified or Registered mail to Purchaser at the Gateway Cafe, 410 Main Street, North Bend, Washington, the seller may elect to declare all of the purchaser's rights hereunder terminated, and upon his doing so, all payments made by purchaser hereunder and all improvements placed upon the premises owned by the corporation shall be forfeited to the seller as liquidated damages, and the seller shall have the right to re-enter and take possession of all property owned by the corporation. In the event of any court action by either party, the prevailing party shall be entitled also to recover his costs and a reasonable attorney's fee." (Exhibit 18.)

the time when it was delinquent or dissolved, the responsibility to perform the terms of the agreement ceased. Thus, they submit they are not personally liable nor can Bypass be liable for performance of the agreement.

As a general rule, a corporate entity and the limitations on liability afforded by corporate structure will be respected by the courts. In certain exceptional cases, however, the device of incorporation may be used to frustrate legitimate obligations. In such cases, courts, in an attempt to bring about justice, have disregarded the corporate entity, looking through form to the reality of the relations between persons and corporations.

Under some circumstances, a transferee corporation may be liable for the obligations of a transferor corporation. Thus, where a transfer is fraudulent or the transferee corporation is a mere continuation or reincarnation of an old corporation, courts have held the new corporation liable for the obligations of the old corporation. *See, e.g., Kueckelhan v. Federal Old Line Ins. Co.,* 69 Wn.2d 392, 411, 418 P.2d 443 (1966); *Pulis v. United States Elec. Tool Co.,* 561 P.2d 68 (Okla. 1977); and *Economy Refining & Serv. Co. v. Royal Nat'l Bank,* 20 Cal. App. 3d 434, 97 Cal. Rptr. 706, 49 A.L.R.3d 872 (1971).

Similarly, the personal liability of corporate officers, directors, or stockholders may result when the facts illustrate an overt intention to disregard the corporate entity by using it for an improper purpose such as violating or evading a duty owed. *See, e.g., Harrison v. Puga,* 4 Wn. App. 52, 480 P.2d 247, 46 A.L.R.3d 415 (1971).

It has been concluded that:

> [w]hile the facts of each case, in which the doctrine of disregarding the corporate entity is applied, vary, there is one situation common to all: a right owned and its corresponding duty owed to the person demanding recognition of his right and the performance of its corresponding duty. . . . When the doctrine of disregard is applied, it is applied because of the necessity of enforcing this right–duty.

(Footnotes omitted.) Horowitz, *Disregarding the Entity of Private Corporations,* 14 Wash. L. Rev. 285, 294 (1939), and Horowitz, *Disregarding the Entity of Private Corporations* 15 Wash. L. Rev. 1 (1940).

Appellants' case involves a factual situation where it was appropriate to disregard the corporate entity, Gateway, in order to enforce an obligation. The facts reflect appellants were presented with a default judgment taken against Gateway when it was under Munroe's control. Rather than seeking to have this judgment set aside, they agreed to a compromise settlement. As soon as they agreed to certain obligations as part of the settlement, they began a series of actions which appear to have been designed to avoid their settlement responsibilities. They refused to contribute to the trust fund. They repudiated an expressly irrevocable assignment of bargaining rights. They stated they did not intend to be bound by any future agreements negotiated on their behalf. Finally, they began dissolution of Gateway. The dissolution eventually left Gateway without a single asset. Bypass, a new corporation with substantially identical ownership, operating the identical business with identical employees in an identical location to Gateway, received all Gateway's assets.

The appellants in good conscience can scarcely complain about the trial court's determination that, in these circumstances, it could not respect Gateway's corporate entity. To do so would in effect place the trial court in the untenable position of assisting in the accomplishment of a breach of duty owed respondent. We find no error in the trial court's conclusions that appellants and Bypass are liable individually and as a corporation for performance of the terms of the challenged agreement.

Next, appellants contend they cannot be liable for the terms of any subsequent agreement negotiated on their behalf by the association. They contend this is so because they have revoked the assignment of negotiation rights which they gave to the association as part of the settlement.

Appellants cite no authority which supports their contention that they have effectively revoked an *expressly irrevocable* assignment of negotiation rights. We have accordingly assumed that none exists, and will not consider this rather novel argument. *Grant County v. Bohne,* 89 Wn.2d 953, 577 P.2d 138 (1978).

Appellants also contend the union representative who was a signatory to the portion of the challenged agreement which bound appellants to contribute to the trust fund was not the employees' agent. They argue that lack of agency renders the agreement invalid.

If we were addressing the *employees'* obligations under a true "collective bargaining" agreement, that is, an agreement negotiated by a union representative selected by the employees as their collective bargaining agent, we might find a discussion of agency relevant. Clearly, agents cannot obligate principals without authority.

In the instant case we are not addressing any question regarding the employees' obligations. Rather, in this case we are concerned with whether appellants, *as employers,* bound themselves to perform certain obligations. We must look to ordinary rules of contract law to answer this question. *Barclay v. Spokane,* 83 Wn.2d 698, 700, 521 P.2d 937 (1974). Under those rules appellants could intentionally promise, for valid consideration, to perform obligations for the benefit of third parties. *See* J. Calamari & J. Perillo, *The Law of Contracts* 379 (1970). Under third–party beneficiary analysis, agency is not determinative, but rather the important question is whether it was intended that the beneficiaries receive the promised performance. *See* 4 A. Corbin, *Corbin on Contracts* § 776 (1951).

In this case the employees were intended beneficiaries. We cannot accept appellants' contention that agency was an additional requisite of validity.

Finally, appellants contend the public policy contained in RCW 49.32.020 prohibits agreements containing a provision

such as is involved in this case. They urge us to hold the agreement void in its entirety.

RCW 49.32.020 states, in pertinent part:

WHEREAS, Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, *though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self–organization, and designation of representatives of his own choosing,* to negotiate the terms and conditions of his employment, and that *he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self–organization* or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the state of Washington are hereby enacted.

(Italics ours.)

In *Krystad v. Lau,* 65 Wn.2d 827, 846, 400 P.2d 72 (1965), we addressed the effect of this policy statement. Faced with a factual setting in which employees were being discharged from employment because of participation in union activities, we held that

Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10 (RCW 49.32-.020), the little Norris–LaGuardia Act, in expressly declaring the public policy of this state, conferred actionable rights on employees, among which rights were *that they be free from coercion, interference and restraint from and by their employers in organizing or joining a labor union and in designating such union as their agent for collective bargaining.*

(Italics ours.)

Then, in *Operating Eng'rs Local 286 v. Sand Point Country Club,* 83 Wn.2d 498, 519 P.2d 985 (1974), we recognized there were hazards attendant upon unrestrained

judicial intervention in the immensely complex area of labor–management relations. We therefore declined to extend *Krystad*'s holding and refused to create an *affirmative duty* on the part of employers to engage in collective bargaining. Nothing in *Sand Point,* however, undermines our earlier recognition in *Krystad* of the basic policy effect of RCW 49.32.020.

Here we are faced with the reverse of *Krystad,* and we look to *Krystad* only in that limited light.

In the instant case, it was stipulated at the outset of trial that only one of appellants' employees was a union member. There had *never* been an election or procedure whereby the employees could or did express interest in unionizing. Yet appellants, as employers, without employee participation agreed to have a certain union represent all of the then employees. They also agreed to discharge those employees who refused to join this union. The employers' action thus forced all employees to become members of a union which the employers, *not the employees,* selected. Further, the terms of the agreement forced employees to accept the union as their bargaining representative.

This unilateral employer action, under *Krystad,* must be viewed in light of RCW 49.32.020, which recognizes the employees' right to be free from the interference of employers in the designation of their bargaining agents. A provision, such as the one contained in the instant agreement, by which the employer agrees to discharge employees who refuse union membership, is not violative of employees' rights when entered into freely and openly, and when it exerts no compulsion upon the then employees of the contracting employer. *Yeager v. Teamsters Local 313,* 39 Wn.2d 807, 812, 239 P.2d 318 (1951). But where such a provision is part of an agreement executed unilaterally by an employer in a situation where employees have neither expressed union interest nor had a voice in the selection of a bargaining agent, and thus have not been privy to the agreement, such a provision interferes with their freedom of choice and their right to select their bargaining agent.

In *Krystad,* we held that conduct which thwarts the intent of RCW 49.32.020 is impliedly prohibited by that statute. In applying *Krystad* to the reverse of the coin considered in that case, we do not extend that holding beyond the unique facts of this case.

This conclusion does not, however, necessitate invalidation of the entire settlement agreement. The parties agreed that the clauses of their agreement are severable and, therefore, should any part be declared invalid, the remaining portions of the agreement are not necessarily invalid. Our review of the agreement indicates appellants, in consideration for satisfaction of the default judgment, agreed to perform other obligations for the benefit of the employees. The performance of the other agreed obligations is not against public policy. As a general rule, such obligations are enforceable. J. Calamari & J. Perillo, *supra* at 573. This case does not present any exception to the general rule. Accordingly, we reverse the judgment of the trial court by invalidating only the one clause of the agreement affording recognition of the union as the employees' exclusive bargaining agent and compelling the employees to join that union or be discharged.

The terms of the agreement being otherwise enforceable, we affirm the trial court's judgment with regard to the enforceability of the agreement in all other respects.

Appellants have also challenged the award of attorney fees, arguing that until a court determines the amount of the delinquent contributions to the trust, the award is premature. The basis for this contention is a provision in an agreement between the union and the association to whom appellants had assigned their negotiation rights. The provision states:

> in the event . . . the Unions . . . retain legal counsel for the purpose of enforcing the payment of delinquent contributions . . . to the Welfare Fund, the delinquent Employer shall be obligated for all reasonable expenses incurred in connection with the collection effort, including reasonable attorney's fees . . .

The award of attorney fees pursuant to statute or contract is a matter committed to the sound discretion of the trial court. In the absence of a clear showing of abuse of discretion, we will not set aside the trial court's award of attorney fees. *Marketing Unlimited v. Jefferson Chem. Co.*, 90 Wn.2d 410, 583 P.2d 630 (1978).

The contractual language granting attorney fees is broad enough to sustain the exercise of the trial court's discretion in this case. We will not disturb the award.

Respondent trust fund has requested an award of attorney fees on appeal. Since the matter must be remanded to the trial court for further proceedings, we leave the award and the amount of such fees to the judgment of the trial court, to be exercised at the conclusion of all proceedings in that tribunal.

The cause is remanded for further proceedings in accordance herewith.

UTTER, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

WRIGHT, C.J., and ROSELLINI, STAFFORD, and DOLLIVER, JJ., concur in the result.

Reconsideration denied March 14, 1979.